Reid Weingarten
1114 Avenue of the Americas
New York, NY 10036
212 506 3900 main
212 506 3955 direct
www.steptoe.com
rweingarten@steptoe.com



July 11, 2019

**VIA ECF**

The Honorable Richard M. Berman
United States District Court
Southern District of New York
United States Courthouse
(212) 805-6715
500 Pearl Street
New York, NY 10007

RE:     *United States v. Jeffrey Epstein,* **Criminal No. 19-490**

Dear Judge Berman:

We write to outline the grounds entitling Jeffrey Epstein to pretrial release, proposing a stringent set of conditions that will effectively guarantee his appearance and abate any conceivable danger he's claimed to present.

In essence, the government seeks to remand a self-made New York native and lifelong American resident based on dated allegations for which he was already convicted and punished – conduct the relitigation of which is barred by a prior federal nonprosecution agreement (the "NPA"). The government makes this drastic demand even though Mr. Epstein has never once attempted to flee the United States – despite a Florida federal judge's stated belief that he could void the NPA in appropriate circumstances, possibly threatening new charges there, and notwithstanding legally erroneous government assertions in ancillary litigation that Mr. Epstein was subject to potential prosecution in other federal judicial districts, including this one specifically. Indeed, Mr. Epstein feared the toxic political climate might tempt the government to try and end-run the NPA – yet continually returned home from travel abroad, fully prepared to vindicate his rights under the agreement and otherwise mount a full-throated defense.  Finally, the government takes its extreme position in the teeth of Mr. Epstein's perfect compliance with onerous sex offender registration requirements – pinpointing his exact nightly whereabouts – across multiple jurisdictions over a 10-year period.

1

Nonetheless, it is fundamental that pretrial detention is reserved for "a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stri[ct] release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." S. Rep. No. 98-225, at 6-7 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3189. And that's true no matter how much rhetoric and hyperbole the government and media pile on a presumptively innocent citizen. Popular condemnation aside, compelling legal issues stand between Mr. Epstein and any possible conviction on the allegations of conduct from 14 to 17 years ago pressed in the indictment. Importantly, the Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, authorizes release for even wealthy defendants facing serious charges who travel and own property abroad.

The government's indictment labels this a "Sex Trafficking" case.  Yes, the government may have witnesses who will testify to participating in sexual massages – most over 18; some under; some who told the police they lied about their age to gain admission to Mr. Epstein's residence; some who will testify that Mr. Epstein knew they were not yet 18.[1]  But their anticipated testimony only punctuates the alleged offenses' purely local nature. (All occurred within a single New York residence or, if the Florida conduct is ultimately ruled admissible despite the NPA, then within two residences.)  There are no allegations in the indictment that Mr. Epstein trafficked anybody for commercial profit; that he forced, coerced, defrauded, or enslaved anybody; or that he engaged in any of the other paradigmatic sex trafficking activity that 18 U.S.C. § 1591 aims to eradicate.  No one seeks to minimize the gravity of the alleged conduct, but it is clear that the conduct falls within the heartland of classic state or local sex offenses – and at or outside the margins of federal criminal law.

Mr. Epstein, 66, is a U.S. citizen who's lived his entire life in this country. Born and bred in Coney Island, he worked his way up from humble origins – his father was a New York City municipal employee in the Parks Department – and earned every penny he's made with nothing more than a high school diploma. He speaks only English and knows no other languages. He owns no foreign businesses and holds no foreign bank accounts. Five of the six residences he maintains are located here in America. His brother, niece, and nephew all live here too.

Until his arrest in this case, Mr. Epstein's only notable brush with the law resulted in the 2007 NPA (Exhibit 1) and a 2008 state-court guilty plea required by the NPA for conduct substantially overlapping the conduct charged in the pending indictment.  As a result of the state guilty plea, Mr. Epstein received a 30-month sentence, 18 months of incarceration, and 12 months' probation under conditions including home confinement.  Mr. Epstein served 13 months in custody, 12 months on probation and, as a condition of the NPA and his state sentence, was required to register as a sex offender in the locations of his residences. He is currently registered

---

[1] New York's age of consent was 17 at the time of the alleged conduct and remains so today. *See* N.Y. Penal Law § 130.05.

in the U.S. Virgin Islands, his principal residence, Florida, and New York. Mr. Epstein has scrupulously fulfilled his obligations in every jurisdiction in which he was required to register throughout the 10-year hiatus between his release and present arrest. All of his travel has been meticulously reported to the registration authorities so that they have been aware of his precise location every single day for the past 10 years. Better still, the pending charges date back 14-17 years, from 2002 to 2005. Yet, tellingly, they allege no recurrence of the conduct underlying the NPA and Florida state conviction at any time in the ensuing decade and a half (2005-2019). Together, these unique factors are powerful indicia that Mr. Epstein is no longer a danger to anyone and will faithfully obey all conditions of release if ordered.

In sum, Mr. Epstein has substantial grounds to challenge the allegations charged by the government in its indictment, and he has every intention of doing so in a lawful, professional, and principled manner.  He intends to fight the current charges on their merits and, more, to contest their legality given the inextricable intertwining of the current investigation and his NPA which promised him immunity and a global settlement for offenses including those brought under 18 U.S.C. § 1591.  Any perception that Mr. Epstein poses any conceivable danger or flight risk may be readily dispelled by a slate of highly restrictive conditions, which amply suffice to secure his release:

1.  Home detention in Mr. Epstein's Manhattan residence, with permission to leave only for medical appointments as approved by Pretrial Services, including (at the Court's discretion) the installation of surveillance cameras at the front and rear entrances to ensure compliance.
2.  Electronic monitoring with a Global Positioning System.[2]
3.  An agreement not to seek or obtain any new passport during the pendency of this matter.[3]

---

[2] "A radio frequency ('RF') bracelet is the more conventional 'ankle bracelet' that has been used over time. GPS monitoring is a more recent phenomenon that is distinct from RF monitoring. While both units are placed on the ankle, the former tracks an offender's movements in real time, while the latter is contingent upon proximity to a base unit connected to a landline at an offender's home. Statistically, GPS monitoring is more effective than RF monitoring at preventing recidivism." *United States v. Paulino*, 335 F. Supp. 3d 600, 617 n.5 (S.D.N.Y. 2018) (citations omitted).

[3] Mr. Epstein has only one active passport permitting current travel – not three, as the government fancies. That one active U.S. passport has now been surrendered. Mr. Epstein has no foreign passports.

3

4. Consent to U.S. extradition from any country and waiver of all rights against such extradition.[4]
5. A substantial personal recognizance bond in an amount set by the Court after reviewing additional information regarding Mr. Epstein's finances, which Mr. Epstein will seek the Court's permission to provide via sealed supplemental disclosure.
6. The bond shall be secured by a mortgage on the Manhattan residence, valued at roughly $77 million. Mr. Epstein's private jet can be pledged as further collateral.
7. Mr. Epstein's brother Mark will serve as a co-surety of the bond, which shall be further secured by a mortgage on Mark's home in West Palm Beach, Florida. Mr. Epstein's friend David Mitchell will also serve as a co-surety and pledge his investment interests in two properties to secure the bond.
8. Mr. Epstein shall deregister or otherwise ground his private jet.[5]
9. He shall demobilize, ground, and/or deregister all vehicles or any other means of transportation in the New York area, providing particularized information as to each vehicle's location.
10. Mr. Epstein will provide Pretrial Services and/or the government random access to his residence.
11. No person shall enter the residence, other than Mr. Epstein and his attorneys, without prior approval from Pretrial Services and/or the Court.
12. Mr. Epstein will report daily by telephone to Pretrial Services (or on any other schedule the Court deems appropriate).
13. A Trustee or Trustees will be appointed to live in Mr. Epstein's residence and report any violation to Pretrial Services and/or the Court.
14. Any other condition the Court deems necessary to reasonably assure Mr. Epstein's appearance.

## I.      Applicable law

Echoing and reinforcing the presumption of innocence, our justice system's bedrock, there is a "strong presumption against [pretrial] detention." *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009). A person facing trial generally must be released so long as some "condition, or combination of conditions . . . [can] reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c). "Only in rare circumstances should release be denied." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). Any doubts as to the propriety of release are resolved in the defendant's favor. *See United States v. Chen*, 820 F. Supp. 1205, 1207 (N.D. Cal. 1992).

---

[4] Mr. Epstein's lone foreign residence is in Paris; France has an extradition treaty with the United States.

[5] Mr. Epstein owns one private jet.  He sold the other jet in June 2019.

Though the Bail Reform Act contains a rebuttable presumption in favor of detention based on the crimes charged, the presumption shifts only the burden of *production*, not persuasion. *See United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986). Accordingly, the statutory demand on defendants "is fairly easily met." *United States v. Conway*, No. 4-11-70756, 2011 WL 3421321, at *2 (N.D. Cal. Aug. 3, 2011). To rebut the presumption, a defendant need only "show that the specific nature of the crimes charged, or that something about their individual circumstances, suggests that 'what is true in general is not true in the particular case . . . '" *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (quoting *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir.1985)). "The quantum of evidence required to rebut the presumption is not high." *United States v. Thompson*, No. 16-CR-00019, 2018 WL 447331, at *2 (M.D. Pa. Jan. 17, 2018) (citation omitted). "Any evidence favorable to a defendant that comes within a category listed in § 3142(g) can affect the operation of [the presumption], including evidence of their marital, family and employment status, ties to and role in the community, clean criminal record and other types of evidence encompassed in § 3142(g)(3)." *Dominguez*, 783 F.2d at 707 (clean record plus socioeconomic stability sufficed to rebut presumption).

In short, evidence that the defendant is unlikely to flee or commit crimes rebuts the presumption, forcing the government to persuade the court that detention is warranted. *See Conway*, 2011 WL 3421321, at *5 (§ 1591 defendant released pending trial). While not disappearing entirely, the presumption thus recedes to one factor among many in determining whether there are sufficient conditions to "reasonably assure" both presence and safety. *See Martir*, 782 F.2d at 1144; *see also United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985) ("[R]easonably assure" doesn't mean "guarantee."). Even in a presumption case, then, "the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community," and by a "preponderance" that he poses a flight "risk." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (citation and internal quotation marks omitted).

## II.     Mr. Epstein's 14-year record of law-abiding behavior rebuts any presumption in favor of pretrial detention

In this case, any danger presumption attending the § 1591 charges evaporates against Mr. Epstein's meticulous obedience, from 2005 to date, to both the law's commands and his rigorous registration and reporting obligations as a convicted sex offender. The indictment does not allege that Mr. Epstein committed any crime in the 14-year interval between the end of the alleged conduct and the initiation of this case.  The dangerousness prong of the Bail Reform Act is predictive, asking whether it's likely that Mr. Epstein will reoffend if released. A spotless 14-year record of walking the straight and narrow, complemented by an exemplary 10-year history of diligent sex offender registration and reporting, is compelling proof he was able, once the prior investigation commenced, to conform his conduct to the law's dictates. The time lag between the offenses charged and today is particularly compelling in terms of a prediction of

5

future danger when viewed in the context of the unparalleled global media attention the case has garnered, including the creation of a website by the government requesting witnesses claiming abuse to come forward. Accordingly, any danger that Mr. Epstein may have once posed to the community has long since abated. At the very least, this enormous gap in time precludes a finding by clear and convincing evidence that no conditions of release can reasonably assure the community's safety.[6]

The rebuttable presumption of a risk of flight is negated by the evidence that the government had stated it believed it could prosecute Mr. Epstein for the very same conduct for which he was immunized, albeit in a second jurisdiction, despite the protections conferred upon him under the NPA. Mr. Epstein's continuous presence in the United States even while he had a residence out of the country reinforces the point. As detailed below, Mr. Epstein understood the NPA as a global resolution of any charges arising from the alleged conduct at issue here, including conduct in New York. Indeed, the government, in a Southern District of Florida filing

---

[6] The government vastly overreaches in painting Mr. Epstein as dangerous based on musty plea discussions. The government's argument that Mr. Epstein's release would risk obstructive behavior, at pages 8-9 of its submission, rests primarily upon statements made between Mr. Epstein's prior counsel and an Assistant U.S. Attorney while they searched for a federal offense, at the government's behest, with a one-year statutory maximum or guideline during the give-and-take of those of plea negotiations. The communication from prior counsel about a potential proffer for a federal charge was met with the response that there was no sufficient evidence to charge such an offense. These purported facts were mere allegations that did not ultimately manifest themselves in any agreement by Mr. Epstein – nor in any agreement that probable cause existed to support any obstruction or assault charge. And the documents from the Southern District of Florida litigation referenced by the government in support of its argument on this point expressly acknowledge this lack of substantiation. *See Jane Doe #1 and Jane Doe #2 v. United States*, 08-CV-80736 (S.D. Fla.), Dkt. 361-10 (prosecutor stating, "[o]n the obstruction charges, many of the facts that I included in that first proffer were hypothesized based upon our discussions and the agents' observations of [redacted]. We will need to interview her to confirm the accuracy of those facts. . . ."), Dkt. 361-11 (prosecutor stating, "I know that someone mentioned there being activity on an airplane, I just wanted to make sure that there is factual basis for the plea that the agents can confirm"), Dkt. 361-9 (prosecutor stating, "I don't know the factual basis for the alleged [redacted] because we have no independent evidence of that"). In short, these were suggested hypotheses not facts, and the government itself ultimately did not believe there was factual support for the allegations. They do not provide a sufficiently reliable factual basis for any finding by clear and convincing evidence. As to the suggestion by the prosecutor that a charge could be predicated on a prior incident where it was alleged that an investigator forced a family member of a witness off the road, the defense is without knowledge as to the basis for this allegation and the conduct, if it occurred, was not attributable to or authorized by Mr. Epstein.

that was unsealed and became public in July 2013, specifically noted that "a number of districts outside the Southern District of Florida (*e.g.*, the Southern District of New York and the District of New Jersey) share jurisdiction and venue with the Southern District of Florida over potential federal criminal charges based on the alleged sexual acts committed by Epstein against the Petitioners.  Epstein is thus subject to potential prosecution for such acts in those districts." Exhibit 2, *Jane Doe #1 and Jane Doe #2 v. United States*, 08-CV-80736 (S.D. Fla. July 5, 2013), Dkt. 205-2, at 9.  The government went so far as to invite the alleged victims "to contact the United States Attorney's Office in those districts and seek to confer with government attorneys in those offices about investigating and potentially prosecuting Epstein based on the alleged federal crimes committed against them." *Id.* at 10.  The Florida U.S. Attorney's Office even offered to share the evidence gathered in its investigation with prosecutors and grand juries in the other relevant jurisdictions.  *See id.* at 10 n.9.

The defense strongly disagrees with the premise that the government can offer and execute an immunity or nonprosecution agreement with a citizen in the location of one of two venues where an interstate telephone call (or flight or any form of wire or mail communication) occurs and then circumvent the consequences of that immunity grant by having the very same prosecution office promote and motivate a prosecution by another office at the second venue of what in fact was a single criminal transaction.  What is significant for bail purposes is that notwithstanding this notice of the government's illegal position, and his knowledge of the substantial penalties that he would face if charged and convicted, Mr. Epstein made no attempt to flee in the approximately six years preceding his arrest.  During that time, as noted by the government, he engaged in substantial international travel, always returning to his residences in the United States.  Mr. Epstein never sought to obtain dual citizenship or took any other steps indicative of an intent to flee.  This fact significantly undermines the government's contentions regarding risk of flight and indicates Mr. Epstein's good-faith intent to contest the charges pending against him.

On September 24, 2007, after a year-long investigation, the Department of Justice, through the United States Attorney for the Southern District of Florida ("USAO-SDFL"), entered into the NPA with Mr. Epstein.  The NPA immunized Mr. Epstein from five distinct potential federal charges that "may have been committed by Epstein . . . from in or around 2001 through in or around September 2007."  Exhibit 1, NPA, at 1-2.  One of the federal charges was 18 U.S.C. § 1591, the statute charged in this SDNY case.  The time period covered by the NPA subsumes the entire time period charged in this SDNY case.  The USAO-SDFL acknowledged in the NPA that the very premise for Mr. Epstein to enter into it was "to resolve *globally* his state and federal criminal liability . . . " *Id.* at 2 (emphasis added).  Senior officials at the Department of Justice reviewed the NPA and either authorized or helped negotiate the resolution of the matter.  *See, e.g.*, United States' Second Supplemental Privilege Log filed as Dkt. 329-1 in *Jane Doe #1 and Jane Doe #2 v. United States*, No. 08-CV-80736 (S.D. Fla.) (the "CVRA litigation") (illustrating the number of prosecutors involved in the decision-making over the NPA).

7

The NPA required Mr. Epstein to plead guilty to a state felony charge (Fla. Stat. § 796.07), then pending in the State of Florida and to an additional state felony charge (not previously charged or required by the State) of violating Fla. Stat. § 796.03 (Case No. 2008-CF-9381AXX), a charge requiring registration as a sex offender.  Mr. Epstein complied with all of his obligations under the NPA.

Contrary to the government's argument, the NPA was not limited to a "list of several dozen victims identified in the prior investigation . . . ."  Gov't Bail Letter at 6-7.  Indeed, the NPA contains no "list of several dozen victims" and regardless, the NPA immunized Mr. Epstein from prosecution "for the *offenses* set out on pages 1 and 2 of this Agreement," allegedly committed between 2001-07, as well as "any offenses that arose from the Federal Grand Jury investigation."  NPA at 2 (emphasis added).  Moreover, the government's interpretation that the NPA "pertained exclusively to the SDFL investigation" and "did not purport to bind any other Office or District" will be the subject of a major dispute in this case.  This is especially so because Mr. Epstein's alleged conduct at his Palm Beach residence features prominently in the conspiracy count (Count 1, ¶¶ 14-19, ¶ 22.a, d, f) and is incorporated by reference in the substantive charge (Count 2, ¶ 23).

Beyond that, Mr. Epstein intends to raise and litigate significant due process issues about the Department of Justice's conduct in this case.  Namely, there is irrefutable evidence from the pending CVRA litigation in the Southern District of Florida that, after Mr. Epstein had fully complied with his obligations under the NPA, the USAO-SDFL affirmatively encouraged alleged victims to pursue prosecution of Mr. Epstein in other districts, in violation of the DOJ's commitment to a "global" resolution.  *See* Exhibit 2, at 8-12.  The United States Attorney for the Southern District of Florida, along with supervisory and line prosecutors from the USAO-SDFL, corresponded on multiple occasions with, and personally conferred with, alleged victims and their lawyers to entertain discussions about the alleged victims' desire to have Mr. Epstein prosecuted on federal charges.  *See id.* at 9.  Further, the Southern District of New York is likely relying upon physical evidence seized in connection with the prior investigation, *see* Gov't Bail Letter at 6 (discussing "corroborating evidence," including "contemporaneous notes, messages . . . , and call records").  In short, there will be evidence that the current New York case is not truly independent of the prior immunized conduct.  The evidence will show that Mr. Epstein's reasonable expectation that the NPA would "resolve globally [Mr. Epstein's] state and federal criminal liability" in exchange for Mr. Epstein's compliance with the duties and obligations in the NPA – which he fully performed – has been unconstitutionally undermined by the government's efforts to minimize the potential consequences of a CVRA conferral violation (one that neither the government nor defense believes occurred but that was found to have occurred in the CVRA litigation which is pending a decision on remedies) by returning an inextricably intertwined second federal prosecution just as the District Court in Florida is receiving submissions on remedy.

8

Finally, the government fails to consider the doctrine of pre-indictment delay, inasmuch as the statute of limitations does not fully define a defendant's rights with respect to delays that occurred prior to the indictment. *See generally United States v. Marion*, 404 U.S. 307 (1971). Here, the delays of 14 years from the last alleged act and 12 years since Mr. Epstein signed the NPA are extraordinary. If the government is correct that the NPA does not, and never did, preclude a prosecution in this district, then the government will have to explain why it purposefully delayed a prosecution of someone like Mr. Epstein, who registered as a sex offender 10 years ago and was certainly no stranger to law enforcement. There is no legitimate explanation for the delay.

## III.     The government fails to meet its burden of proving that no combination of conditions will assure Mr. Epstein's appearance and public safety

An analysis of the relevant statutory factors and case law supports pretrial release. Even should the Court conclude, despite substantial evidence to the contrary, that the defendant presents a risk of flight, the foregoing combination of conditions virtually guarantees his appearance as required. Crucially, while it is always possible to hypothesize risks, the statutory standard requires only a *reasonable* assurance that the defendant, if released, will appear. The conditions proposed above, including electronic GPS monitoring, surrender of Mr. Epstein's passport, deregistration and/or grounding of Mr. Epstein's private plane, and a substantial personal bond (including posting of personal residence(s) and/or private jet as security to guarantee appearance) would extinguish any plausible risks. Mr. Epstein's current notoriety minimizes any conceivable risk of flight even further. The location where he could be detained – his residence on East 71st Street in New York has entrances (one on the street, one in the back) that can be easily monitored by video. With all of his financial resources in the United States (other than his Paris residence) and with his New York residence at risk due to the government's forfeiture allegation, Mr. Epstein would be sacrificing virtually everything he has worked for – including any collateral the Court requires he post to secure his appearance – if he were to flee and to disentitle himself to the defense of his property whether it would be at risk to forfeiture or for a bail violation.

To the extent there is any doubt regarding the proposed conditions, there is tremendous moral suasion provided by the posting of real and personal property of Mr. Epstein's brother, and his close personal friend of decades, who have offered to co-sign a surety bond to ensure Mr. Epstein's appearance in Court as required. Indeed, Mr. Epstein's brother has agreed to pledge his family home, that he shares half the year with his 14-year-old daughter and 17-year-old son, in order to secure the bond. It is particularly telling that Mr. Epstein's brother, his only living immediate family member, as well as his close personal friend, are both willing to guarantee his appearance, notwithstanding the widespread negative publicity of Mr. Epstein that has dominated the news cycle since his arrest.

9

To reiterate, the Bail Reform Act requires pretrial release on the "*least restrictive*" conditions that will assure both appearance and public safety.  18 U.S.C. § 3142(c)(1)(B) (emphasis added).  Home confinement monitored by 24-hour private security guards – a lesser restriction than pretrial detention – has proven effective in meeting those goals in many prominent cases prosecuted in our Circuit, including cases against defendants as infamous as Bernie Madoff, Marc Dreier and David Brooks.

To be clear, defense counsel are fully confident Mr. Epstein will appear as required without resort to this measure. And we understand and appreciate Your Honor's opposition to it. *See United States v. Zarrab*, No. 15-CR-867, 2016 WL 3681423 (S.D.N.Y. June 16, 2016). Still, Mr. Epstein stands ready and willing to pay for 24-hour armed guards should the Court deem it necessary or appropriate.

More precisely, we realize that Your Honor objects to the measure as more akin to custody than release, finding it inequitable for wealthier defendants to "buy their way out" of jail pending trial. *Id.* at *2, *9-10, *13 (citation omitted).  Nonetheless, a band of other courts in our area have endorsed the procedure,[7] and the Second Circuit has affirmed its use.[8]

For reasons explained elsewhere, round-the-clock, privately funded security guards will virtually *guarantee* – not just reasonably assure – Mr. Epstein's presence in the circumstances of this case.  Accordingly, and given the division of authority surrounding the practice, we respectfully propose it here as a fallback, asking the Court to revisit its propriety despite the reservations expressed in *Zarrab*.  Those reservations, though admirably motivated and sincerely held, raise substantial equal protection concerns.  They impair the statutory right to release on the *least restrictive conditions in the circumstances presented* – an inherently individualized determination – based largely on socioeconomic status, a suspect if not invidious classification. Avoiding "inequity and unequal treatment" rooted in such dubious socioeconomic distinctions – doing "equal right to the poor" and "rich" alike – are imperatives that run both ways. *Id.* (bolding deleted) (citation, footnote and internal quotation marks omitted).

---

[7] *See, e.g.*, *United States v. Esposito*, 354 F. Supp. 3d 354 (S.D.N.Y. 2019); *United States v. Esposito*, 309 F. Supp. 3d 24 (S.D.N.Y. 2018); *United States v. Seng*, No. 15-CR-706, 2017 WL 2693625 (S.D.N.Y. Oct. 23, 2015); *United States v. Dreier*, 596 F. Supp. 2d 831 (S.D.N.Y. 2009); *United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009); *United States v. Schlegel*, No. 06-CR-550, 2008 WL 11338900, at *1 (E.D.N.Y. June 13, 2008), *modification denied*, 2008 WL 11339654 (E.D.N.Y. July 2, 2008).

[8] *See United States v. Esposito*, 749 F. App'x 20 (2d Cir. 2018); *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007).

10

Other than his 2008 guilty plea predicated on conduct substantially overlapping the same conduct charged here, Mr. Epstein has no criminal history. Congress specifically listed these factors as considerations for the Court, and their absence therefore should weigh in favor of Mr. Epstein's pretrial release.  Mr. Epstein comes from a stable and humble family background.  All of his remaining family members, his brother, niece, and nephew, reside in the United States. Through his business and the five residences he maintains in the United States, Mr. Epstein employs people, many of whom have been with him for more than a decade, and feels personally responsible for their livelihoods.  Mr. Epstein is admittedly wealthy with all of his financial resources (other than his Paris residence) in the United States (including the U.S. Virgin Islands) and will provide the Court with more specific information regarding his assets in a sealed supplemental disclosure prior to the upcoming bail hearing if the Court grants leave to file such a sealed supplement.  Mr. Epstein has, to this point, not provided a complete financial disclosure on advice of counsel, motivated by a desire to ensure the accuracy of the information provided to the Court.  During the years since his release from incarceration in connection with his Florida guilty plea, Mr. Epstein has been a law-abiding citizen without a single allegation of criminal misconduct during that period and has focused his efforts on business and philanthropy.  At the Court's request, Mr. Epstein will provide a sealed list of his philanthropic donations.

Crucially, the government has failed to proffer any evidence that Mr. Epstein has ever indicated an intent to flee from this investigation or any other criminal matter, which several courts have observed is a critical factor in evaluating whether pretrial release is appropriate.  *See Hanson*, 613 F. Supp. 2d at 90 ("In this case, . . . there is no strong circumstantial evidence indicating that Mrs. Hanson intends to flee the United States"); *United States v. Vortis*, 785 F.2d 327 (D.C. Cir.1986) (serious intent to flee is an important factor); *United States v. Cole*, 715 F. Supp. 677, 679 (E.D. Pa.1988) (defendant told undercover agents he would flee if arrested).  In fact, Mr. Epstein has displayed long-term, consistent compliance with Court orders and other legal requirements.  As a result of his 2008 guilty plea and corresponding sex-offender designation, Mr. Epstein is required to (1) register for life as a sex offender; (2) regularly verify his address with Virgin Islands, Florida, and New York authorities; (3) annually update his registry photograph; and (4) provide registration authorities with detailed itineraries for all travel (both domestic and international) in which he engages.  Mr. Epstein has strictly complied with these requirements, without exception, for approximately ten years.

The Court inquired about the relationship of the New York State registration classification and the requirements of the Bail Reform Act.  And while it is true that the New York Appellate Division held that Mr. Epstein was appropriately classified as a level-three sex offender, this inquiry was entirely backward-looking and based on the allegations contained in a Florida probable cause affidavit describing conduct ending in 2005 that were neither admitted-to nor within the scope of Mr. Epstein's guilty plea.  *See People v. Epstein*, 89 A.D. 3d 570, 571 (N.Y. App. Div. 2011).  While Mr. Epstein has made no subsequent attempt to challenge the continuing nature of his designation, his law-abiding behavior for the ensuing decade plus

11

significantly undercuts any suggestion of current dangerousness based on any regulatory classification.  Moreover, as discussed above, Mr. Epstein's strict compliance with the various monitoring requirements associated with his sex-offender registration actually decrease any danger that he might otherwise pose.  It is also worth noting that Mr. Epstein is classified as a tier-one sex offender, the lowest classification available, in the U.S. Virgin Islands, where he maintains his primary residence.  The defense respectfully suggests that Mr. Epstein's Virgin Islands designation is more consistent with the circumstances of the actual offenses for which he was convicted, and certainly more consistent with the predictive factor of whether there is a danger of recidivism which the defense contends there is not.

Mr. Epstein's financial means and past international travel do not extinguish this Court's congressional mandate to order pretrial release in every case where reasonable conditions can assure the appearance of the defendant as required.[9]  Indeed, numerous courts have rejected government requests for detention, and instead ordered pretrial release, in cases where the charged defendant was either a non-citizen (unlike Mr. Epstein) or a naturalized citizen with substantial if not weightier contacts with foreign jurisdictions, including the following decisions:

- *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) (reversing district court order of detention of defendants, who were natives of Indonesia, and ordering release despite defendants' "strong motive to flee" because of serious charges and "strong" evidence of guilt, despite finding that defendants faced "lengthy term of incarceration" if convicted, despite finding defendants possessed "ample means to finance flight," despite finding that defendants "maintained strong family ties to their native countries as well as personal and professional ties to various locations in Europe and the Middle East," and despite finding that defendants "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations");

- *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004) (affirming district court order of pretrial release of defendant, a resident and citizen of Denmark-from where defendant could not be extradited-charged with bulk cash smuggling and forfeiture, noting that the

---

[9] This Court's opinion in *Zarrab* stands only for the proposition that wealthy defendants should not be provided an unfair advantage.  It does not, of course, suggest that wealthy defendants should bear a special disadvantage.  The facts supporting the Court's ruling of pretrial detention in *Zarrab* are easily distinguishable.  The present case does not have national security implications, Mr. Epstein is a United States citizen (and does not possess any dual citizenship), the only foreign country in which Mr. Epstein maintains a residence (France) has an extradition treaty with the United States, Mr. Epstein's assets are almost all located in the United States (with the exception of his Paris residence), and Mr. Epstein has provided only truthful information to Pretrial Services.

"bail statute does not . . . require that foreign defendants be detained simply because their
return cannot be guaranteed through extradition");

- *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004) (ordering release of
  defendant, an Israeli national who had resided in South Africa for the 18 years preceding
  his arrest when he landed in Colorado for a family ski trip based on allegations he
  violated the Export Administration Act and the International Economic Emergency
  Powers Act by acquiring products capable of triggering nuclear weapons and exported
  them to Pakistan, despite defendant's lack of any ties to the United States, despite finding
  that defendant had "no ties to the United States or the Washington, D.C. area," despite
  finding that "no evidence [was] presented establishing that Defendant has ever lived in
  this country, owned property here, or that he has any family or community ties in the
  United States," despite finding that defendant "was only in this country in order to
  participate in a ski vacation with his wife and daughter," and despite finding that "the
  weight of the evidence against Defendant is substantial");

- *United States v. Hanson*, 613 F. Supp. 2d 85 (D.D.C. 2009) (ordering release of
  defendant, a naturalized citizen of the United States, despite finding defendant "has
  strong ties to [her home country of] China," finding that the defendant owned property in
  China, that the defendant spent almost all of her ten years of marriage living abroad with
  her husband, that during 2008 the defendant spent only 22 days in the United States, that
  the charges against the defendant (violations of International Emergency Economic
  Powers Act and the Export Administration Regulations) "were serious and carried a
  potential for a significant period of incarceration" and that the "government has strong
  evidence against" the defendant "including her own statement to investigators that she
  smuggled the UAV autopilot components out of the United States and knew there were
  licensing requirements for such items").

The fact that the government will potentially seek a significant sentence if Mr. Epstein is
convicted on all counts similarly does not preclude pretrial release in this case – several courts
have ordered pretrial release despite finding that the defendant faced serious charges carrying
significant potential sentences. *See, e.g., Sabhnani*, 493 F.3d 63 (reversing district court order of
detention despite finding that defendants, natives of Indonesia, faced "lengthy term of
incarceration" and "strong" evidence of guilt existed); *Karni*, 298 F. Supp. 2d 129 (ordering
release of defendant, an Israeli national who had resided in South Africa for the 18 years
preceding his arrest, despite finding that "the weight of the evidence against Defendant is
substantial"); *Hanson*, 613 F. Supp. 2d 85 (noting that charges "were serious and carried a
potential for a significant period of incarceration" and that the "government has strong evidence
against" the defendant "including her own statement to investigators that she smuggled the UAV
autopilot components out of the United States and knew there were licensing requirements for
such items"). As the government concedes, the increases in sentencing exposure enacted after

13

the alleged conduct at issue here do not apply retroactively to Mr. Epstein's case (including a maximum sentence of life imprisonment and a mandatory minimum sentence of 10 years). Mr. Epstein would, moreover, be subject to prosecution if he fled, which he now knows carries a maximum penalty of up to 10 additional years of imprisonment, 18 U.S.C. § 3146(b)(l)(A)(l), and/or the real risk of an enhanced sentence by the Court in this matter if not acquitted.

It must further be emphasized that the allegations outlined within the indictment are just that – allegations – and the defendant anticipates substantial factual and legal challenges to the government case.  For one thing, Epstein has potent legal defenses to prosecution under 18 U.S.C. § 1591, the sex trafficking statute driving the pending indictment. We front and briefly outline one of those defenses for the limited purpose of seeking bail. We will amplify it later, along with various other arguments, in full-blown dismissal motions.

Section 1591 was passed as part of the Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386, 114 Stat. 1464 (October 28, 2000).  In enacting the TVPA, Congress recognized that human trafficking, particularly of women and children in the sex industry, "is a modern form of slavery, and it is the largest manifestation of slavery today." 22 U.S.C. § 7101(b)(1); *see also id*. at § 7101(b)(2), (4).  "The TVPA criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial gain." *United States v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007).  Importantly, "the entire language and design of the statute as a whole indicates that it is meant to punish those who are the providers or pimps of children, *not the purchasers or the johns*."  *Fierro v. Taylor*, No. 11-CV8573, 2012 WL 13042630, at *3 (S.D.N.Y. July 2, 2012) (quoting *United States v. Bonestroo*, No. 11-CR-40016, 2012 WL 13704, at *4 (D.S.D. Jan. 4, 2012)) (emphasis added).  In *Fierro*, the district court found § 1591 inapplicable to consumers or purchasers of sex acts.  Here, the principal conduct underlying the indictment is Mr. Epstein's payment of money for massages that purportedly escalated to alleged sex acts.  Mr. Epstein's conduct, however, is akin to consumer or purchaser behavior and should be outside the ambit of 18 U.S.C. § 1591.  *See Fierro*, 2012 WL 13042630, at *4 ("[T]he TVPA is inapplicable to individual purchasers of sex from trafficking victims…").[10]

---

[10] While *Fiero* represents the law in this district, Mr. Epstein notes that there is a division of authority on the scope of § 1591.  *See United States v. Jungers*, 702 F.3d 1066, 1068 (8th Cir. 2013).  The defense respectfully submits that the *Fiero* court's approach to this issue is more persuasive and more consistent with the Congressional purpose to target commercial sex trafficking.

**IV.      Sixth Amendment**

Finally, in a case such as this one, which will likely involve voluminous discovery and is predicated on events allegedly occurring 14 or more years ago, it is critical to counsel's ability to provide effective assistance, as well as the defendant's ability to meaningfully contribute to his defense, that Mr. Epstein be permitted pretrial release.  The Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense.  It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' and who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.'" *Faretta v. California*, 422 U.S. 806, 819 (1975).  Given the unique circumstances of this case, Mr. Epstein's exercise of these important Constitutional rights would be materially impaired by his pretrial detention.

**V.      Conclusion**

Wherefore, for all of the foregoing reasons, Mr. Epstein respectfully submits that his conduct over the past 14 years proves that he poses no risk of flight or threat to the safety of the community.  Even if the Court should have concerns to the contrary, there clearly exist a combination of conditions that would be sufficient to assure his presence as required and/or the safety of the community, including but not limited to some or all of the conditions proposed *supra*, or any other conditions the Court deems necessary and appropriate.

Yours truly,

Reid Weingarten
Steptoe & Johnson, LLP (NYC)
1114 Avenue of the Americas
New York, NY 10036
(202)-506-3900
Fax: (212)-506-3950
rweingarten@steptoe.com

Martin G. Weinberg (application for admission *pro hac vice* forthcoming)
Martin G. Weinberg, P.C.
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
Fax: (617) 338-9538
owlmgw@att.net

15

Marc Allan Fernich
Law Office of Marc Fernich
810 Seventh Ave
Suite 620
New York, NY 10019
(212) 446-2346
Fax: (212) 446 2330
maf@fernichlaw.com

16