*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 12, 2019

**VIA ECF**

The Honorable Richard M. Berman
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

    Re:    *United States* v. *Jeffrey Epstein*, 19 Cr. 490 (RMB)

Dear Judge Berman:

    The Government respectfully submits this letter in response to the defendant's Motion for Pretrial Release (the "Release Motion"), dated July 11, 2019 (Dkt. 6), and in further support of its Memorandum in Support of Detention (the "Detention Memo"), submitted to Magistrate Judge Pitman on July 8, 2019, which is attached hereto and incorporated herein (Ex. A).

## PRELIMINARY STATEMENT

    The defendant is a serial sexual predator who is charged with abusing underage girls for years. A grand jury has returned an indictment alleging that he sexually exploited dozens of minors, including girls as young as 14 years old, in New York and Florida. To this day, he is a registered sex offender designated by New York State in the highest category of risk to reoffend, despite unsuccessfully attempting to have that classification lowered. And any doubt that the defendant is unrepentant and unreformed was eliminated when law enforcement agents discovered hundreds or thousands of nude and seminude photographs of young females in his Manhattan mansion on the night of his arrest, more than a decade after he was first convicted of a sex crime involving a juvenile.

    The defendant also faces substantial evidence of his guilt, founded on the corroborated testimony of numerous victims, and this case presents the very real possibility that he will go to prison for the rest of his life. The defendant has at his disposal a vast fortune, the details of which remain largely concealed from the Court. He also has a history of obstruction and manipulation of witnesses, including, as detailed herein, as recently as within the past year, when media reports about his conduct reemerged. And he continues to show a shocking lack of understanding of the gravity of the harm he has perpetrated, including through the minimization of his conduct and casual disparagement of victims in his arguments.

    Against this backdrop of significant—and rapidly-expanding—evidence, serious charges, and the prospect of a lengthy prison sentence, the defendant proposes to be released on conditions that are woefully inadequate. The Release Motion misconstrues and misunderstands the relevant

law, seeks to diminish and demean the harm caused to the many victims of the defendant's appalling sexual abuse, and utterly fails to meet its burden of rebutting the presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. Rather than even attempting to address the grave risks of releasing a defendant with extraordinary financial resources and a history of abusing minors, the defendant instead proposes a bail package that amounts to little more than a barely-secured bond masquerading as a 14-point plan. The Court should reject the defendant's application and order him detained pending trial.

Among other things, the proposed bail package contemplates the defendant pledging as the principal security a property that has already been identified by the Government as subject to forfeiture upon the defendant's conviction, and which therefore is of no value as collateral. His proposed global waiver of extradition is unenforceable, and even if enforceable would be little comfort to victims forced to wait additional years while the defendant is located and returned to this country. The promise to "deregister or otherwise ground" his private jet is meaningless given his wealth and ability to easily secure other means of travel. The two co-signers he proposes only further highlight his minimal community ties, including his lack of any family in or near the District. Electronic monitoring would merely give the defendant less of a head start in fleeing— and does not guard against the risk of him endangering victims in the very home where he has continued to hoard nude images of young women and girls. And the private security force he proposes to guard his gilded cage, a proposal already rejected by this Court in similar circumstances, simply reinforces the obvious fact that the defendant should be housed where he can be secured at all times: a federal correctional center.

The defendant faces a presumption of detention, Pretrial Services has recommended detention, and victims of the defendant seek his detention. Because there are no set of conditions short of incarceration that can reasonably assure the appearance of the defendant or reasonably protect the community from the dangers he poses if released, the Court should order him detained.

## BACKGROUND

As previously set forth, a federal grand jury in this District returned an indictment (the "Indictment") charging the defendant with violating Title 18, United States Code Section 1519, and conspiracy to commit the same.

As charged by the grand jury, the facts giving rise to those counts involve a years-long scheme to sexually abuse underage girls. Specifically, the defendant enticed and recruited dozens of minor girls to engage in sex acts with him, for which he paid the victims hundreds of dollars in cash, in at least two different states. Victims were initially recruited to provide "massages" to the defendant, which would be performed nude or partially nude, would become increasingly sexual in nature, and would typically include one or more sex acts, including groping and direct or indirect contact with victims' genitals. To perpetuate this exploitation of underage girls, the defendant actively encouraged certain victims to recruit additional girls to be similarly sexually abused. He paid these victim-recruiters hundreds of dollars for each additional girl they brought to him, creating a network of underage victims for him to exploit in New York and Palm Beach.

The defendant, through counsel, continues to evidence a complete lack of appreciation for the gravity of the offenses with which he is charged.[1] As an initial matter, there can be no plausible suggestion that the allegations against the defendant involve isolated or aberrational conduct; they involve repeated, regular acts of sexual abuse committed over a period of many years. And following the defendant's prior conviction, as described previously by the Government, the defendant continued to maintain at least hundreds and possibly thousands of nude photos of young subjects. The defendant's victims in this case, often particularly vulnerable girls, were as young as 14 years old when he abused them. The defendant knew he was abusing minors, including because victims told him directly they were underage. And he preyed on his victims habitually and repeatedly—day after day, month after month, year after year.

The defense calls these disturbing alleged acts "simple prostitution."[2] Mag. Tr. 12:12; *see also* D. Tr. at 6:15-19 ("This is basically the Feds today . . . redoing the same conduct that was investigated 10 years ago and calling it, instead of prostitution, calling it sex trafficking"). That characterization is not only offensive but also utterly irrelevant given that federal law does not recognize the concept of a child prostitute—there are only trafficking victims—because a child cannot legally consent to being exploited. Defense counsel's repeated assertion that the Government's case is infirm because no threats or coercion are alleged—*e.g.*, Mag. Tr. at 12 ("There was no coercion. There were no threats. There was no violence."), 17 ("there was no coercion. There was no intimidation. There is no deception."); Release Motion at 2 ("There are no allegations . . . that he forced, coerced, defrauded, or enslaved anybody . . . .")—is equally irrelevant because the offense with which the defendant has been charged requires no such proof. *See, e.g.*, *United States v. Afyare*, 632 F. App'x 272, 278 (6th Cir. 2016) ("We hold that § 1591(a) criminalizes the sex trafficking of children (less than 18 years old) with or without any force, fraud, or coercion, and it also criminalizes the sex trafficking of adults (18 or older), but only if done by force, fraud, or coercion.").

Far more important, the defense has already effectively conceded that the Government will be able to present evidence of the actual primary elements of the charged offense—*i.e.*, that the defendant engaged in sex acts for money with girls he knew were underage. *See* Release Motion at 2. On this record, the Government agrees with Pretrial Services that the defendant should be detained pending trial. He poses a tremendous risk of flight and a danger to the community, and he cannot overcome the statutory presumption in favor of detention in this case.

---

[1] Such arguments are unsurprising from a defendant who previously compared himself to a "person who steals a bagel" or a tragic mythical figure. *See*, *e.g.*, Amber Southerland, *Billionaire Jeffrey Epstein: I'm a sex offender, not a predator*, N.Y. Post (2011) ("'I'm not a sexual predator, I'm an "offender,"' the financier told The Post yesterday. 'It's the difference between a murderer and a person who steals a bagel.'"); Philip Weiss, *The Fantasist*, NY Magazine (2007) ("'It's the Icarus story, someone who flies too close to the sun,' I said. 'Did Icarus like massages?' Epstein asked.").

[2] "Mag. Tr." refers to the transcript of the hearing before Magistrate Judge Pitman on July 8, 2019; "D. Tr." refers to the transcript of the hearing before this Court on July 8, 2019.

Honorable Richard M. Berman
United States District Judge
July 12, 2019
Page 4

## ARGUMENT

The Government respectfully submits that the defendant cannot overcome the statutory presumption in favor of detention in this case for the following reasons, among others:

### I. Victims Seek Detention

Pursuant to the Crime Victims' Rights Act ("CVRA"), a crime victim has the right to be reasonably heard at certain public proceedings in the district court, including proceedings involving release. 18 U.S.C. § 3771(a)(4). Consistent with that requirement, the Government has been in contact with victims and counsel identified through this investigation in connection with the argument regarding bail.

Multiple victims and/or their counsel have asked the Government to seek detention (and to inform the Court of their views in that respect) for multiple reasons. First, they believe that the defendant's continued detention is necessary under the CVRA's right to be reasonably protected from the accused. 18 U.S.C. § 3771(a)(1). They have specifically conveyed to the Government that they would be fearful for their safety if the defendant were released. For the reasons articulated herein, the Government believes those concerns to be well-founded.

Additionally, certain victims have asked the Government to advise the Court that they are specifically concerned about the defendant's proposal to be released even if under conditions that included home detention and full-time private guards. They believe it would be unfair to victims of a wealthy defendant, like Epstein, if he were to be given greater freedoms than others would be in similar circumstances, and that such an arrangement would be inconsistent with their rights. They specifically asked the Government to advise the Court that they believed such an arrangement could result in harassment and abuse by the defendant.[3]

### II. The Defendant's Proposal Does Nothing to Mitigate His Flight Risk

Each of the relevant factors to be considered as to flight risk—the nature and circumstances of the offense, the strength of the evidence, and the history and characteristics of the defendant—counsel strongly in favor of detention, and the defendant's proposed package would do nothing whatsoever to mitigate those risks.

A. <u>Defendant Proposes No Infringement Upon His Ability to Use his Vast Wealth to Flee</u>

It might not be immediately apparent to a reader of the Release Motion that the defendant is extravagantly wealthy and worth, according to records relating to the defendant recently obtained by the Government from a financial institution ("Institution-1"), more than $500 million.

---

[3] The Government is aware of at least one additional attorney for a victim who has publicly stated that her client supports the pretrial detention of the defendant. The Government is unaware of any victim who has expressed support for the defendant being granted pretrial release on bail.

Indeed, while the defendant has still not filled out a financial affidavit, under penalty of perjury, in connection with his application for bail, his token effort to account for his finances makes painfully clear the need for detention. The defendant reports having an extraordinary amount of money in both total assets and cash or cash-equivalent holdings. And while the defendant repeatedly represents in his Release Motion that his assets are "in the United States," there is absolutely nothing in the defendant's minimal financial submission to verify that.

Indeed, and as discussed further below, even assuming the defendant's assets are *presently* in the United States, nothing in the proposed package would prevent the defendant from transferring liquid assets out of the country quickly and in anticipation of flight or relocation. The defendant is an incredibly sophisticated financial actor with decades of experience in the industry and significant ties to financial institutions and actors around the world. He could easily transfer funds and holdings on a moment's to places where the Government would never find them so as to ensure he could live comfortably while a fugitive.

But perhaps most important, even were the defendant to sacrifice *literally all* of his current assets, there is every indication that he would immediately be able to resume making millions or tens of millions of dollars per year outside of the United States. He already earns at least $10,000,000 per year, according to records from Institution-1, while living in the U.S. Virgin Islands, traveling extensively abroad, and residing in part in Paris, France; there would be little to stop the defendant from fleeing, transferring his unknown assets abroad, and then continuing to do whatever it is he does to earn his vast wealth from a computer terminal beyond the reach of extradition.[4]

That the defendant faces up to 45 years of incarceration on the current counts with which he is charged provides the motive for him do so and is another significant factor in assessing the risk of flight. *See United States v. Jackson*, 823 F.2d 4, 7 (2d Cir. 1987). So too is the strength of the evidence, detailed above and in the Government's Detention Memo. Indeed, that evidence, already robust less than a week ago when the Indictment was unsealed, is growing stronger by the day. Just since the Indictment was unsealed, several additional women, in multiple jurisdictions, have identified themselves to the Government as having been victimized by the defendant when they were minors. Moreover, pursuant to judicially-authorized search warrants, the Government has discovered and seized a significant volume of photographs of nude and seminude young women and girls in the defendant's Manhattan residence, and is in the process of reviewing dozens of electronic discs that contain still more such photos.[5] And dozens of individuals have called the Government in recent days to convey information regarding the defendant and the allegations

---

[4] As noted in the Government's Detention Memo, the defendant is a frequent traveler and regularly travels to and from the United States, including approximately more than 20 flights in which he traveled to or from a foreign country since 2018 alone. Extensive international travel of this nature further demonstrates a significant risk of flight. *See, e.g.*, *United States v. Anderson*, 384 F. Supp. 2d 32, 36 (D.D.C. 2005).

[5] The Government's review of these materials, seized earlier this week, remains ongoing.

contained in the Indictment. All this in less than a week, and all in addition to an Indictment that already alleges the existence of dozens of victims in New York and dozens of victims in Florida.

B. <u>The Proposed Bond is Inadequate to Overcome the Presumption of Detention</u>

The defendant's "slate of highly restrictive" measures which purportedly "amply suffice to secure his release" are neither highly restrictive nor amply sufficient. Rather, they are effectively standard conditions of home confinement, monitoring, and bond unsecured by the defendant's assets—broken out into 14 pieces. The Government will address the most concerning and salient elements of the defendant's proposal below.

1. Lack of Meaningful Bond Security

The defendant proposes that the Court accept his Manhattan mansion as the primary security for a personal recognizance bond of an indeterminate amount, to be co-signed by the defendant's brother and a friend. Release Motion at 4. This is plainly insufficient.

As an initial matter, and as noted above, the defendant's Manhattan mansion has been identified in the Indictment as subject to forfeiture because it is alleged to have been used to commit or facilitate the commission of the sex trafficking offenses charged there. *See* 18 U.S.C. § 1594(c)(1). Because the defendant would thus be likely to lose that property following a conviction, it provides no value whatsoever as collateral. *See* 18 U.S.C. § 3142(g)(4) ("In considering the conditions of release described . . . the judicial officer . . . shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required."). And while the defendant offers to also pledge his private jet as additional collateral, there is absolutely no reason to assume that the defendant would not readily trade his private plane for his freedom. Indeed, the defendant, who has a net worth of more than $500 million, by his own admission recently sold a second plane and thus presumably has cash on hand to replace the posted aircraft without difficulty if need be.

Nor does the proposed security of properties owned by two identified co-signers meaningfully change the calculus. As further described below, the defendant provides no information about the value or equity of the property of his brother, Mark (the "Palm Beach Property"), or the significance of that property in the context of his brother's own net worth.[6] Similarly, the defendant provides no details regarding the "investment interests" of his friend Mr. Mitchell, nor any reason to believe the loss of those "interests" would be meaningful to Mr. Mitchell, let alone the defendant. More generally, given the defendant's proffered net worth, the defendant could easily make his co-signers whole – and even reward them – were he to flee.

The proposed security, in sum, should give the Court little comfort the defendant would appear in Court if released on bail.

---

[6] In fact, the defendant's own submission makes clear that the Palm Beach Property is not his brother's exclusive residence and that his brother lives elsewhere for half of the year.

2. Co-Signers, Moral Suasion, and Ties to the Community

The dearth of detailed financial information about the defendant himself, much less his brother or friend, further shows the hollowness of the proposal. The Court cannot possibly evaluate whether there would be any incentive whatsoever for those the two proposed co-signers to exercise moral suasion over the defendant—or whether, as noted above, the defendant could easily compensate them, perhaps many times over, for any loss they incurred through the defendant's flight from justice. The defendant provides no information about his brother other than that he lives half the year in the home he purportedly would pledge, and even less information about Mr. Mitchell, other than that he is "Mr. Epstein's friend," his "close personal friend of decades," and his "close personal friend." Release Motion at 4, 9. Their willingness to "guarantee" his appearance, Release Motion at 9, is meaningless in the absence of such information.

Moreover, the notion that *any* individual co-signer could meaningfully secure a bond for this defendant strains credulity. Given the defendant's wealth and his extraordinary risk of flight, any bond for this defendant would assuredly have to be in the hundreds of millions of dollars to even be claimed to be sufficient to guard against the risks posed by the defendant's release. The defendant offers no reason to believe any co-signers could meaningfully sign such a bond, much less these two particular individuals, which is yet another reason the proposed package is patently insufficient.

3. The Defendant's "Consent" to Extradition is Unenforceable and Impractical

The defendant's offer to sign a so-called "consent" to extradition provides no additional reassurance whatsoever. As an initial matter, the Government would need to find and re-arrest the defendant before such a waiver would even come into play. Moreover, even assuming the Government could locate and apprehend the defendant, numerous courts have recognized that such purported waivers are unenforceable and effectively meaningless because any defendant who signs such a purported waiver and then flees will assuredly contest the validity and/or voluntariness of the waiver, and will get to do so in the jurisdiction of his choosing (*i.e.*, the one to which he chose to flee). *See, e.g.*, *United States v. Morrison*, No. 16-MR-118, 2016 WL 7421924, at *4 (W.D.N.Y. Dec. 23, 2016); *United States v. Kazeem*, No. 15 Cr. 172, 2015 WL 4645357, at *3 (D. Or. Aug. 3, 2015); *United States v. Young*, Nos. 12 Cr. 502, 12 Cr. 645, 2013 WL 12131300, at *7 (D. Utah Aug. 27, 2013); *United States v. Cohen*, No. C 10-00547, 2010 WL 5387757, at *9 n.11 (N.D. Cal. Dec. 20, 2010); *United States v. Bohn*, 330 F. Supp. 2d 960, 961 (W.D. Tenn. 2004); *United States v. Stroh*, No. 396 Cr. 139, 2000 WL 1832956, at *5 (D. Conn. Nov. 3, 2000); *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985). . The Department of Justice's Office of International Affairs is unaware of any country anywhere in the world that would consider an anticipatory extradition waiver binding. And, of course, the defendant could choose to flee to a jurisdiction with which the United States does not have an extradition treaty.

Beyond being impossible to guarantee, extradition is typically a lengthy, complicated and expensive process, and the possibility that it would be successful neither provides any real deterrent to the defendant's incentive to flee nor any measure of justice to the victims who would be required to wait years for his return.

Honorable Richard M. Berman
United States District Judge
July 12, 2019
Page 8

### 4. Home Confinement and Electronic Monitoring Provide No Assurance

The defendant's proposal of ankle-bracelet monitoring should be of no comfort to the Court. In particular, the defendant's endorsement of a GPS monitoring bracelet rather than a radio frequency bracelet is farcical because neither one is useful or effective *after it has been removed.* At best, home confinement and electronic monitoring would reduce his head start should he decide to cut the bracelet and flee. *See United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (rejecting defendant's application for bail in part because home detention with electronic monitoring "at best . . . limits a fleeing defendant's head start"); *see also United States v. Casteneda*, No. 18 Cr. 047, 2018 WL 888744, at *9 (N.D. Cal. Feb. 2018) (same); *United States v. Anderson*, 384 F. Supp.2d 32, 41 (D.D.C. 2005) (same); *United States v. Benatar*, No. 02 Cr. 099, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (same).

### 5. Private Security is Inadequate, Unfair, and Impractical Here

The defendant also proposes the use of a private security force to march him to and from court under the threat of deadly force. This proposal should be rejected.

At the outset, it is far from clear that private jail, which seeks to replicate the conditions of a government-run detention facility in the defendant's home, is a condition of "release" that implicates the Bail Reform Act. "[T]here is a debate within the judiciary over whether a defendant, if she is able to perfectly replicate a private jail in her own home at her own cost, has a right to do so under the Bail Reform Act and the United States Constitution." *United States v. Valerio*, 9 F. Supp. 3d 283, 292 (E.D.N.Y. 2014) (Bianco, J.) (collecting cases). The Second Circuit has never directly addressed this issue. *See United States v. Sabhnani*, 493 F.3d 63, 78 n.18 (2d Cir. 2007) ("The government has not argued and, therefore, we have no occasion to consider whether it would be 'contrary to the principles of detention and release on bail' to allow wealthy defendants 'to buy their way out by constructing a private jail." (citations omitted)). Indeed, a decision by this Court reasoned that "the very severe restrictions" in the private jail proposal presented to him did "not appear to contemplate 'release' so much as it describes a very expensive form of private jail or detention." *United States v. Zarrab*, 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016).

Courts have long been troubled by private jail proposals like the defendant's which, "at best 'elaborately replicate a detention facility without the confidence of security such a facility instills.'" *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (quoting *United States v. Gotti*, 776 F. Supp. 666, 672 (E.D.N.Y. 1991) (rejecting private jail proposal)); *see also Valerio*, 9 F. Supp. 3d at 295 ("The questions about the legal authorization for the private security firm to use force against defendant should he violate the terms of his release, and the questions over whether the guards can or should be armed, underscore the legal and practical uncertainties—indeed, the imperfections—of the private jail-like concept envisioned by defendant, as compared to the more secure option of an actual jail."). A private security firm simply cannot replicate the controlled environment of a federal correctional facility, in which, typically, all of the needs to the prisoner can be attended to without placing the prisoner in the community at large; the defendant's proposed private jail arrangement would have the effect of permanently placing him in just such a high-flight-risk circumstance. The risk of a public escape attempt while in the community and involving

armed private guards attempting to stop the defendant, potentially by force—rather than the defendant being in the environment of a federal facility—also greatly magnifies the danger of the defendant's flight to the public. *See United States v. Boustani*, 356 F. Supp. 3d 246, 257 (E.D.N.Y. 2019). "This is why, as the Government correctly notes, federal prisoners should be detained in facilities run by trained personnel from federal correctional facilities." *Id.* at 258 (citing *Sabhnani*, 493 F.3d at 74 n.13 ("To the extent [armed private guards] implies an expectation that deadly force may need to be used to assure defendant['s] presence at trial ... [s]uch a conclusion would, in fact, demand a defendant's detention")).

The Second Circuit has held it is not legal error "for a district court to decline to accept," as "a substitute for detention," a defendant hiring private security guards to monitor him. *United States v. Banki*, 369 Fed. App'x 152, 153-54 (2d Cir. 2010). In the same decision, the Second Circuit noted that it was "troubled" by the possibility of "allow[ing] wealthy defendants to buy their way out by constructing a private jail." (internal quotation marks omitted)). *Id.*; *accord, e.g.*, *United States v. Cilins*, No. 13 Cr. 315 (WHP), 2013 WL 3802012, at *3 (S.D.N.Y. July 19, 2013) ("'it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the Government, even if carefully selected'" (quoting *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001))); *Valerio*, 9 F. Supp. 3d at 293-94 (E.D.N.Y. 2014) ("There is nothing in the Bail Reform Act that would suggest that a defendant (or even, hypothetically, a group of defendants with private funding) has a statutory right to replicate or construct a private jail in a home or some other location.").

The defendant's payment of his guards also raises the conflict of interest inherent in having the defendant having extraordinary influence over a private security company tasked with guarding him, leaving the company's incentives entirely aligned with the defendant. *See*, *e.g.*, *Boustani*, 356 F. Supp. 3d at 257 (in finding that private armed guards would not reasonably assure the appearance of a defendant, noting a "clear conflict of interest—private prison guards paid by an inmate" and noting that in a recent S.D.N.Y. case involving private security guards the defendant "was outside of his apartment virtually all day, every weekday; was visited by a masseuse for a total of 160 hours in a 30-day period; and went on an unauthorized visit to a restaurant in Chinatown with his private guards in tow"); *see also United States v. Tajideen*, 17 Cr. 046, 2018 WL 1342475, at *5-6 (D.D.C. Mar. 15, 2018) (finding *Zarrab* "particularly instructive" and further noting: "While the Court has no reason to believe that the individuals selected for the defendant's security detail would intentionally violate federal law and assist the defendant in fleeing the Court's jurisdiction, it nonetheless is mindful of the power of money and its potential to corrupt or undermine laudable objectives. And although these realities cannot control the Court's ruling, they also cannot be absolutely discounted or ignored.").

Finally, in *Zarrab* this Court found that "the Defendant's privately funded armed guard proposal is unreasonable because it helps to foster inequity and unequal treatment in favor of a very small cohort of criminal defendants who are extremely wealthy, such as Mr. Zarrab." 2016 WL 3681423, at *13; *see also Boustani*, 356 F. Supp. 3d at 258 ("although this Defendant has vast financial resources to construct his own 'private prison,' the Court is not convinced 'disparate treatment based on wealth is permissible under the Bail Reform Act'") (quoting *United States v.*

Honorable Richard M. Berman
United States District Judge
July 12, 2019
Page 10

*Bruno*, 89 F. Supp. 3d 425, 432 (E.D.N.Y. 2015) (""Even if Defendant had the financial capacity to replicate a private jail within his own home, this Court is not convinced that such a set of conditions would be sufficiently effective in this case to protect the community from Defendant, or that such disparate treatment based on wealth is permissible under the Bail Act.")); *Borodin*, 136 F. Supp. 2d at 134 (E.D.N.Y. 2001) (Nickerson, J.) ("It is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the government, even if carefully selected.").

If the defendant's appearance can only be assured through use of round-the-clock guards, the defendant belongs in a federal detention center, not released under bail conditions that effectively create a private prison of one, using guards to be paid by the defendant himself. It is frankly outrageous for the defendant to suggest that preventing him from using his vast wealth to duplicate a private prison that cannot control, monitor, and contain him consistent with the requirements of the Bail Act would cause him to somehow "bear a *special disadvantage*." Release Motion at 12 n.9. Indeed: "What more compelling case for an order of detention is there than a case in which only an armed guard and the threat of deadly force is sufficient to assure the defendant's appearance?" *Zarrab*, 2016 WL 3681432, at *12 (quoting *United States v. Valerio*, 9 F. Supp. 3d at 295).

### III.     The Defendant Provides No Assurance He is Not a Danger to the Community and a Risk to Obstruct Justice

A. <u>Danger to the Community</u>

In the first instance, the defendant's argument that 14 years without a criminal conviction eliminates "any danger presumption" should be rejected. Were that the case—which is certainly is not—a lack of criminal record for any defendant would automatically rebut the presumption applicable to crimes such as sex trafficking. That is manifestly incorrect. *See United States v. Artis*, 607 F. App'x 95, 97 (2d Cir. 2015) (finding that a defendant's lack of criminal record was "not so compelling as to defeat the presumption or to manifest clear error in the district court's determination that no combination of release conditions . . . could reasonably assure against dangerousness and the risk of flight"). Moreover, here, the defendant not only has a criminal record, but has been convicted of a sex crime involving a minor.

But the ongoing and forward-looking danger posed by the defendant is further demonstrated by the defendant's maintenance of a substantial collection of photographic trophies of his victims and other young females in his mansion, as discovered by the Government through its search warrants. As indicated in the Detention Memo, the many discs found in the defendant's residence included those with hand-written labels including the following: "Young [Name] + [Name]," "Misc nudes 1," and "Girl pics nude." Not surprisingly, the Government has found that such discs contain photographs of sexually suggestive photographs of fully- or partially-nude females appearing to be underage.

B.  Danger to Obstruct Justice

The defendant has also already demonstrated a willingness to use intimidation and aggressive tactics in connection with a criminal investigation.  Far from being "musty," Release Motion at 6 n.6, the defendant's past behavior in connection with being *investigated* for sexually abusing children is the best predictor of his likely incentives and activities in connection with being *charged* with sexually abusing children.  For example, in the incident the defendant now claims was not attributable to or authorized by him, the contemporaneous police report indicates that pressure tactics were *at the very least* coordinated closely with individuals in the defendant's orbit.  See Palm Beach Police Report (the "Police Report") (Ex. B).  According to the Police Report, the parent of one of the defendant's victims was driven off the road by a private investigator.  The Police Report provides further information regarding victim and witness threats and intimidation reported against an individual who was directly in contact with an assistant of the defendant, followed "immediately" by a call to that same individual from a phone number associated with the defendant's businesses and associates.

Separately, and in addition, there are also extensive allegations of obstruction and tampering in connection with civil lawsuits brought against the defendant following his 2008 conviction.  See *Doe v. United States*, 08 Civ. 80736 (S.D. Fla.), Dkt. 291-15 at 21-23, 31.  Moreover, police reports suggest that an associate of Epstein's was offering to buy victims' silence during the course of the prior investigation.  Specifically, one victim reported that "she was personally contacted through a source that has maintained contact with Epstein," who "assured [the victim] that she would receive monetary compensation for her assistance in not cooperating with law enforcement."  Indeed, the victim reported having been told: "*Those who help him will be compensated and those who hurt him will be dealt with.*"  See Palm Beach Police Report (Ex. C).

And Epstein's efforts to influence witnesses continue to this day.  As in the past, within recent months. he paid significant amounts of money to influence individuals who were close to him during the time period charged in this case and who might be witnesses against him at a trial.  By way of background, on or about November 28, 2018, the *Miami Herald* began publishing a series of articles relating to the defendant, his conduct, and the circumstances of his prior conviction and the non-prosecution agreement ("NPA").  Records obtained by the Government from Institution-1 appear to show that just two days later, on or about November 30, 2018, the defendant wired $100,000 from a trust account he controlled to an individual named as a possible co-conspirator in the NPA.  The same records appear to show that just three days after that, on or about December 3, 2018, the defendant wired $250,000 from the same trust account to another individual named as a possible co-conspirator in the NPA and also identified as one of the defendant's employees in the Indictment.  Neither of these payments appears to be recurring or repeating during the approximately five years of bank records presently available to the Government.  This course of action, and in particular its timing, suggests the defendant was attempting to further influence co-conspirators who might provide information against him in light of the recently re-emerging allegations

### IV. The Defendant Raises Legal Arguments Not Relevant Here

Finally, the defendant raises certain legal arguments he contends he will litigate at the appropriate stage and which he further suggests mitigate in favor of bail. None is meritorious, and certainly none should give the Court any comfort whatsoever that the defendant would, if granted bail, refrain from fleeing so he could attempt to vindicate himself via dubious legal strategies. Nevertheless, the Government will address the defendant's arguments briefly in turn.

#### A. The Non-Prosecution Agreement Does Not Preclude Prosecution

As an initial matter, as the Court itself noted at the parties' initial appearance earlier this week, and as the defendant appears to concede, the instant Indictment charges conduct well beyond the scope of the NPA – that is, alleged conduct that occurred here in New York and involving New York based victims. D. Tr. 6-8; Release Motion at 2. For present purposes, that alone is sufficient to put this issue to rest, because even assuming the defendant were to mount a meritorious challenge to the NPA, he would still have to stand trial on Count Two of the Indictment and additional charges brought based on New York conduct.

But more generally, the reasons the defendant can be prosecuted in the Southern District of New York—or anywhere else outside the SDFL—are manifold. The language of the NPA overwhelmingly refers to the SDFL, and the core terms and text of the agreement are limited to the SDFL. The prefatory language states: "THEREFORE, on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida, prosecution *in this District for these offenses* shall be deferred in favor of prosecution by the State of Florida."[7] The final paragraph of the prefatory language also states, among other things, that after fulfilling the terms of the agreement, "no prosecution for the [sex abuse] offenses set out on pages 1 and 2 of this Agreement, nor any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office, nor any offenses that arose from the Federal Grand Jury investigation will be instituted *in this District*."

In its terms section, the NPA further states that Epstein's signature "is not to be construed as an admission of civil *or criminal liability* or a waiver of any jurisdictional or other defense" as to any victim whose identity was not disclosed by SDFL to Epstein, as provided for in the NPA, and additionally states that neither Epstein's signature nor any resulting waivers or civil settlements "are to be construed as admissions or evidence of civil or criminal liability or a waiver of any jurisdictional or other defense as to any person." These provisions show the parties contemplated possible criminal prosecutions in other jurisdictions and/or based on victims not initially identified in the Florida investigations (whether in Florida or elsewhere). The final substantive paragraph of the NPA states that "Epstein hereby requests that the *United States Attorney for the Southern District of Florida* defer [. . .] prosecution."

It is well settled in the Second Circuit that "a plea agreement in one U.S. Attorney's office does not, unless otherwise stated, bind another." *United States v. Prisco*, 391 F. App'x 920, 921

---

[7] All emphases relating to the NPA are added unless otherwise specified.

(2d Cir. 2010) ("A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction.") (citing *United States v. Annabi,* 771 F.2d 670, 672 (2d Cir. 1985) (per curiam)). Moreover, any references in an NPA to the "Government" or the "United States" do not abrogate these principles. *Annabi*, 771 F.2d at 672 ("[A] plea agreement whereby a federal prosecutor agrees that 'the Government' will dismiss counts of an indictment . . . might be thought to bar the United States from reprosecuting the dismissed charges in any judicial district unless the agreement expressly limits the scope of the agreement . . . . However, the law has evolved to the contrary."). "The mere use of the term 'government' in the plea agreement does not create an affirmative appearance that the agreement contemplated barring districts other than the particular district entering into the agreement." *United States v. Salameh*, 152 F.3d 88, 120 (2d Cir. 1998) (citations and internal quotation marks omitted); *see also United States v. Brown*, No. 99-1230, 2002 WL 34244994, at *2 (2d Cir. Apr. 26, 2002) (in analyzing an SDFL plea agreement, reiterating the holding of *Annabi* and noting that it applies "even if the plea agreement purports to bind 'the Government'" or the "United States") (summary order); *United States v. Bruno*, 159 F. Supp. 3d 311, 321 (E.D.N.Y. 2016) ("The Court disagrees with Defendant's argument that the phrase 'United States' shows an intent to bind all United States Attorney's Offices. Rather, the plea agreement covers only Defendant's liability in the SDFL.").[8]

In sum, this issue is a distraction that has little relevance to the bail determination and does nothing to address the defendant's risk of flight or mitigate the danger he poses to the community.

B. <u>The Defendant Wrongly Argues the Statute Does Not Apply to His Sex Trafficking</u>

Next, the defendant wrongly argues that the "principal conduct" giving rise to the charges is his payment of underage girls for sex acts, and that such conduct could not possibly fall under the charged statutes. As the defendant implicitly concedes, Release Motion at 14, this is an issue for a motion to dismiss. Nevertheless, the defendant's argument is incorrect for two reasons.

First, although the defendant undoubtedly participated on the demand side of the crime, he was also instrumental on the supply side given his role in recruiting and causing others to recruit additional victims. He organized, funded, and perpetuated a sex trafficking *scheme* in two states, including with co-conspirators. The fact that he did so for his own eventual and frequent sexual gratification does not vitiate his role in enticing and recruiting victims, consistent with the elements of the offense with which he is charged. The defendant was the leader of a sex-trafficking enterprise, not a mere consumer.

---

[8] This analysis similarly extends to a non-prosecution agreement. *See United States v. Laskow*, 688 F. Supp. 851, 854 (E.D.N.Y. 1988) ("Defendant's argument, in effect, is that unless there is an explicit statement to the contrary, it is presumed that a non-prosecution agreement binds offices of the United States Attorney that are not parties to the agreement. This position is at odds with the law in this Circuit, which presumes a narrow reading of the boundaries of a plea agreement unless a defendant can affirmatively establish that a more expansive interpretation was contemplated.") (citing *Annabi*, 771 F.2d at 672).

Second, he is also wrong on the law. Courts have found that Section 1591 applied to both suppliers and consumers of commercial sex acts. *See*, *e.g.*, *United States v. Jungers*, 702 F.3d 1066, 1069 (8th Cir. 2013) (upholding the conviction of a defendant who attempted to pay for oral sex from an underage girl and explaining: "The sole issue raised on appeal is whether '[t]he plain and unambiguous provisions of 18 U.S.C. § 1591 apply to both suppliers and consumers of commercial sex acts.' We conclude they do.") (alteration in original). The lone case cited by the defendant, *Fierro v. Taylor*, No. 11 Civ. 8573, 2012 WL 13042630 (S.D.N.Y. July 2, 2012), relied heavily on the statutory interpretation undertaken by two district courts in the District of South Dakota, *United States v. Bonestroo*, No. 11 Cr. 40016, 2012 WL 13704 (D.S.D. Jan. 4, 2012), and *United States v. Jungers*, 11 Cr. 40018, 2011 WL 6046495 (D.S.D. Dec. 5, 2011), both of which were explicitly overruled by the Eighth Circuit decision in *Jungers*, 702 F.3d 1066. In the seven years since *Fierro* has been decided, it does not appear to have been cited by a single other court. Additionally, other cases in this Circuit and elsewhere have upheld convictions of procurers or customers. *See United States v. O'Connor*, 650 F.3d 839 (2d Cir. 2011) (upholding convictions under Section 1591 of both the buyer and seller of a child); *United States v. Cook*, 782 F.3d 983 (8th Cir. 2015) (rejecting a constitutional challenge that Section 1591 would be void for vagueness if applied to purchasers); *United States v. Mikoloyck*, No. 09 Cr. 036, 2009 WL 4798900 (W.D. Mo. Dec. 7, 2009) ("contrary to defendant's argument, 18 U.S.C. § 1591 clearly applies to those who attempt to purchase underage sex, not merely the pimps of actual exploited children") (citing *United States v. Roberts*, 174 F. App's 475 (11th Cir. 2006) (in which defendant was convicted under sections 1591(a) and 1594(a) even though no actual children were involved)).

## CONCLUSION

As set forth above, the defendant's proposed bail package is insufficient and insubstantial. Pretrial Services, victims, and the Government all recommend pretrial detention due to the unusual and concerning confluence of factors in this case, including the defendant's extraordinary wealth, demonstrated willingness to interfere with victims and witnesses, continued possession of lewd photographs of young females, and both the incentive and means to flee prosecution.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Alex Rossmiller / Alison Moe / Maurene Comey
Assistant United States Attorney
Southern District of New York
Tel: (212) 637-2415 / 2225 / 2324

Cc:   Martin Weinberg, Esq., and Reid Weingarten, Esq., *counsel for defendant*