*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 8, 2019

**VIA ECF**

The Honorable Henry Pitman
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

    Re:    *United States* v. *Jeffrey Epstein*, 19 Cr. 490 (RMB)

Dear Judge Pitman:

    The Government respectfully submits this letter in advance of the bail hearing scheduled for July 8, 2019, in the above-captioned case. For the reasons set forth herein, the Court should order that the defendant be detained pending trial; he cannot meet his burden of overcoming the presumption that there is no combination of conditions that would reasonably assure his continued appearance in this case or protect the safety of the community were he to be released.

    As set forth below, the charges in this case are exceptionally serious: the defendant is alleged to be a serial sexual predator who preyed on dozens of minor girls over a period of years, and he now faces a potentially massive prison sentence predicated on substantial and multifaceted evidence of his guilt. In light of the strength of the Government's evidence and the substantial incarceratory term the defendant would face upon conviction, there is an extraordinary risk of flight, particularly given the defendant's exorbitant wealth, his ownership of and access to private planes capable of international travel, and his significant international ties. Indeed, the arrest of the defendant occurred when he arrived in the United States on his private jet after having returned from a multi-week stay abroad.

    Finally, and as detailed herein, the Government has real concerns—grounded in past experience with this defendant—that if allowed to remain out on bail, the defendant could attempt to pressure and intimidate witnesses and potential witnesses in this case, including victims and their families, and otherwise attempt to obstruct justice. As a result, he poses both an acute danger to the community, including some of its most vulnerable members, and a significant risk of flight. The defendant thus cannot overcome the statutory presumption that detention is appropriate in this case, and the Court should order that he be detained pending trial.

Honorable Henry Pitman
United States Magistrate Judge
July 8, 2019
Page 2

## BACKGROUND

A. Overview

On July 2, 2019, a federal grand jury in the Southern District of New York returned a sealed indictment (the "Indictment") charging the defendant with one count of sex trafficking of minors, in violation of 18 U.S.C. § 1591, and one count of conspiracy to commit sex trafficking of minors, in violation of 18 U.S.C. § 371.

As charged by the grand jury, the facts underlying the charges in the Indictment arise from a years-long scheme to sexually abuse underage girls. In particular, beginning in at least 2002, the defendant enticed and recruited dozens of minor girls to engage in sex acts with him, for which he paid the victims hundreds of dollars in cash.

He undertook this activity in at least two different locations, including his mansion in Manhattan, New York (the "New York Residence") and his estate in Palm Beach, Florida (the "Palm Beach Residence"). In both New York and Florida, the defendant perpetuated this abuse in similar ways. Victims were initially recruited to provide "massages" to the defendant, which would be performed nude or partially nude, would become increasingly sexual in nature, and would typically include one or more sex acts, including groping and direct or indirect contact with victims' genitals. The defendant paid his victims hundreds of dollars in cash for each separate encounter.

Moreover, the defendant actively encouraged certain of his victims to recruit additional girls to be similarly sexually abused. He incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each additional girl they brought to him. In this fashion, the defendant created a vast network of underage victims for him to exploit, in locations including New York and Palm Beach.

The defendant's victims were as young as 14 years old when he abused them. Many of his victims were, for various reasons, often particularly vulnerable to exploitation. The defendant intentionally sought out—and knew that he was abusing—minors. Indeed, in some instances, his victims expressly told him they were underage before or during the period in which he abused them.

In creating and maintaining a network of minor victims whom he abused, the defendant worked with others, including employees and associates who facilitated his exploitation of minors by, among other things, contacting victims and scheduling their sexual encounters with the defendant, both in New York and in Florida.

B. The Defendant

Jeffrey Epstein designed, financed, and perpetrated this scheme, both as its main participant and through his direction of others, including certain of his employees, to further facilitate his rampant abuse of underage girls.

Honorable Henry Pitman
United States Magistrate Judge
July 8, 2019
Page 3

As has been widely reported, the defendant is extraordinarily wealthy, and he owns and maintains luxury properties and residences around the world, including in Manhattan, New York; Palm Beach, Florida; Stanley, New Mexico; and Paris, France. Additionally, Epstein owns a private island in the U.S. Virgin Islands which, as noted above, is believed to be his primary residence in the United States. His mansion in Manhattan alone—a multi-story townhouse reported to be one of the largest single residences in all of Manhattan, which previously housed a school and which he owns through an LLC—has been valued at approximately $77 million. Entities controlled by the defendant also own at least two private jets in active service, at least one of which is capable of intercontinental travel.

As described further below, the defendant possesses three active United States passports, and his international connections and travels are extensive. For example, in addition to maintaining a residence in Paris, France, as described above, in the past 18 months alone, the defendant has traveled abroad, via private jet, either into or out of the country on approximately more than 20 occasions.

C. The Prior Florida Investigation

In or about 2005, the defendant was investigated by local police in Palm Beach, Florida, in connection with allegations that he had committed similar sex offenses against minor girls. The investigation ultimately also involved federal authorities, namely the U.S. Attorney's Office for the Southern District of Florida ("SDFL") and the FBI's Miami Office, and included interviews with victims based in the Palm Beach area, including some of the alleged victims relevant to Count One of the instant Indictment.[1]

In fall 2007, the defendant entered into a non-prosecution agreement with the SDFL in connection with the conduct at issue in that investigation, which the non-prosecution agreement identified as including investigations into the defendant's abuse of minor girls in the Palm Beach area. The Southern District of New York was not a signatory to that agreement, and the defendant was never charged federally.[2] In June 2008, the defendant pled guilty in state court to one count of procuring a person under the age of 18 for prostitution, a felony, and one count of solicitation of prostitution, a felony. As a result, the defendant was designated as a sex offender with registration requirements under the national Sex Offender Registration and Notification Act.

---

[1] The non-prosecution agreement, further discussed below, was entered into at the conclusion of the SDFL investigation and did not purport to cover any victims outside of the State of Florida. As noted above, the instant Indictment expressly alleges the existence of dozens of victims who were abused in this District in addition to dozens of victims who were abused in Florida.

[2] While beyond the scope of a bail hearing, as discussed further below, it is well-established in the Second Circuit that absent an express provision to the contrary in the agreement, one District is not bound by the terms of an agreement entered into between a defendant and a U.S. Attorney's Office in another district. *See* page 6, *infra*.

Honorable Henry Pitman
United States Magistrate Judge
July 8, 2019
Page 4

## ARGUMENT

I. <u>Applicable Law</u>

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. *See*, *e.g.*, *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *See*, *e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Chimurenga*, 760 F.2d at 405. In addition, a court may also order detention if there is "a serious risk that the [defendant] will . . . attempt to obstruct justice, or . . . to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B); *see also United States v. Friedman*, 837 F.2d 48 (2d Cir. 1988).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character . . . [and] financial resources"; and (4) the seriousness of the danger posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); *Ferranti*, 66 F.3d at 542 (same); *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Additionally, where, as here, a defendant is charged with committing an offense involving a minor victim under 18 U.S.C. § 1591, it shall be presumed, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(E).

II. <u>Discussion</u>

The defendant should be detained pending trial. For the reasons set forth below, it is difficult to overstate the risk of flight and danger to the community if the defendant is released, and for those reasons, the defendant cannot overcome the statutory presumption in favor of detention in this case.

Honorable Henry Pitman
United States Magistrate Judge
July 8, 2019
Page 5

### A. The Defendant Poses an Extreme Flight Risk

Each of the relevant factors to be considered as to flight risk – the nature and circumstances of the offense, the strength of the evidence, and the history and characteristics of the defendant – counsel strongly in favor of detention.

#### 1. The Nature and Circumstances of the Offense and the Strength of the Evidence

The "nature and circumstances" of this offense plainly favor detention. 18 U.S.C. § 3142(g)(1) (specifically enumerating "whether the offense. . . involves a minor victim" as a factor in bail applications). Indeed, the crime of sex trafficking of a minor is so serious that for a defendant charged with that offense, there is a presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142 (e)(3)(E). Here, as specified in the Indictment, the defendant's conduct was committed serially, over a period of years, and affected dozens of victims.

The seriousness of the charge is also reflected in the penalties the defendant faces, which include up to 45 years of incarceration for Counts One and Two of the Indictment.[3] As the Second Circuit has noted, the possibility of a severe sentence is a significant factor in assessing the risk of flight. *See Jackson*, 823 F.2d at 7; *see also United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."). Here, the defendant is facing a statutory maximum of decades in prison. Even in the absence of means—which, as discussed in detail below, the defendant has in abundance—this fact alone would provide a compelling incentive for anyone to fail to appear. It is particularly compelling for a defendant who is 66 years old and therefore faces the very real prospect of spending the rest of his life in prison if convicted.

The likelihood of a substantial period of incarceration is buttressed by the strength of the evidence. As set forth in the Indictment, the evidence in this case is strong. The Indictment alleges that the defendant sexually abused dozens of minor victims, and the conspiracy count lists numerous overt acts committed in furtherance of the defendant's crimes.[4]

---

[3] The current penalties for violations of 18 U.S.C. § 1591 include a 10 year mandatory minimum sentence. However, that punishment was created through an amendment to the statute in 2006. The penalty for a violation of Section 1591 during the period charged in the Indictment, and therefore relevant here, was a maximum of 40 years' imprisonment.

[4] With respect to the evidence in this case, the Court should start its analysis by accepting that the Indictment is sufficient, on its own, to establish probable cause that the defendant committed the crimes of sex trafficking and sex trafficking conspiracy. *Contreras*, 776 F.2d at 54. ("Were an evidentiary hearing addressing the existence of probable cause required in every § 3142(e) case in which an indictment had been filed, the court would spend scarce judicial resources considering that which a grand jury had already determined, and have less time to focus on the application of

Honorable Henry Pitman
United States Magistrate Judge
July 8, 2019
Page 6

Multiple victims, including several specified in the Indictment, have provided information against the defendant.  That information is detailed, credible, and corroborated, in many instances, by other witnesses and contemporaneous documents, records and other evidence—including, as further detailed below, evidence from a search of the New York Residence on the night of the defendant's arrest that reflects an extraordinary volume of photographs of nude and partially-nude young women or girls.  Such corroborating evidence also includes documents and other materials, such as contemporaneous notes, messages recovered from the defendant's residence that include names and contact information for certain victims, and call records that confirm the defendant and his agents were repeatedly in contact with various victims during the charged period.  Put simply, all of this evidence – the voluminous and credible testimony of individuals who were sexually abused by the defendant as minors, each of whom are backed up by other evidence – will be devastating evidence of guilt at any trial in this case and weighs heavily in favor of detention.

Finally, it bears noting that neither the age of the conduct nor the defendant's previous non-prosecution agreement ("NPA") with a different federal district pose any impediment to his conviction.  As an initial matter, all of the conduct is timely charged, pursuant to 18 U.S.C. § 3283, which was amended in 2003 to extend the limitations period for conduct that was timely as of the date of the amendment, to any time during the lifetime of the minor victim.  *See United States v. Chief*, 438 F.3d 920, 922-25 (9th Cir. 2006) (finding that because Congress extended the statute of limitations for sex offenses involving minors during the time the previous statute was still running, the extension was permissible); *United States v. Pierre-Louis*, No. 16 Cr. 541 (CM), 2018 WL 4043140, at *1 (S.D.N.Y. Aug. 9, 2018) (same).

Moreover, with respect to the NPA, that agreement, to which the Southern District of New York was not a party, which by its express language pertained exclusively to the SDFL investigation, and which did not purport to bind any other Office or District, does not preclude prosecution in this District for at least two reasons.  *First,* it is well settled in the Second Circuit that "a plea agreement in one U.S. Attorney's office does not, unless otherwise stated, bind another." *United States v. Prisco*, 391 F. App'x 920, 921 (2d Cir. 2010) ("A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction.") (citing *United States v. Annabi,* 771 F.2d 670, 672 (2d Cir. 1985) (per curiam)).  This is true even if the text of the agreement purports to bind "the Government."  *See Annabi*, 771 F.2d at 672.  This analysis similarly extends to a non-prosecution agreement.  *See United States v. Laskow*, 688 F. Supp. 851, 854 (E.D.N.Y. 1988) ("Defendant's argument, in effect, is that unless there is an explicit statement to the contrary, it is presumed that a non-prosecution agreement binds offices of the United States Attorney that are not parties to the agreement.  This position is at odds with the law in this Circuit, which presumes a narrow reading of the boundaries of a plea agreement unless a defendant can affirmatively establish that a more expansive interpretation was contemplated.") (citing *Annabi*, 771 F.2d at 672).  *Second*, the Indictment charges conduct not covered by the NPA, namely

---

the presumptions and the § 3142(g) factors in deciding whether the defendant should be detained.").

Honorable Henry Pitman
United States Magistrate Judge
July 8, 2019
Page 7

conduct that occurred in New York. The prior NPA included a list of several dozen victims identified in the prior investigation, all of whom were abused in the State of Florida, and none of whom are a part of the conduct charged in Count Two of the instant Indictment.

Each of these factors—the seriousness of the allegations, the strength of the evidence, and the possibility of lengthy incarceration—creates an extraordinary incentive to flee. And as further described below, the defendant has the means and money to do so.

2. The Characteristics of the Defendant

The history and characteristics of the defendant also strongly support detention. The defendant is extraordinarily wealthy and has access to vast financial resources to fund any attempt to flee. Indeed, his potential avenues of flight from justice are practically limitless.

As the defendant acknowledged in his most recent New York State sex offender registration, he has *six* residences, including two in the U.S. Virgin Islands (including his own private island), and one each in Palm Beach, Florida; Paris, France; New York, New York; and Stanley, New Mexico. The most recent estimated value of the defendant's New York City mansion alone is more than $77 million. The most recent tax-assessed value of the defendant's Palm Beach estate is more than $12 million. The defendant's primary residence is a *private island* in the U.S. Virgin Islands, a place where any sort of meaningful supervision would be all but impossible.

Moreover, the defendant has access to innumerable means to flee. His sex registration documentation of "current vehicles" lists no fewer than 15 motor vehicles, including seven Chevrolet Suburbans, a cargo van, a Range Rover, a Mercedez-Benz sedan, a Cadillac Escalade, and a Hummer II. These cars are registered in various states and territories including the Virgin Islands, New York, Florida, and New Mexico. The defendant also has access to two private jets, giving him the ability to leave the country secretly and on a moment's notice and to go virtually anywhere he wants to travel. He is a very frequent international traveler and regularly travels to and from the United States by private plane. In particular, between January 1, 2018, and the present, U.S. Customs and Border Patrol has logged approximately more than 20 flights in which Epstein was traveling to or from a foreign country. Indeed, he was arrested at Teterboro Airport arriving on just such a private international flight after having spent approximately three weeks abroad. Extensive international travel of this nature further demonstrates a significant risk of flight. *See*, *e.g.*, *United States v. Anderson*, 384 F. Supp. 2d 32, 36 (D.D.C. 2005). There can be no assurance that, upon release, the defendant would suddenly lack access to such means of travel.

Finally, the defendant has no meaningful ties that would keep him in this country. The defendant has no known immediate family. He is not married and has no children. He has friends and associates worldwide, as demonstrated by his extensive international travel, and his professional obligations, if any, can and seemingly are plainly capable of being handled by the defendant remotely. Simply put, there would be no meaningful reason for the defendant to remain in the country, while he would have every incentive (and every resource needed) to flee.

Nor would home confinement with electronic monitoring reasonably assure the defendant's presence as required. At best, home confinement with electronic monitoring would

merely reduce his head start should he decide to flee. *See United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (Gleeson, J.) (rejecting defendant's application for bail in part because home detention with electronic monitoring "at best . . . limits a fleeing defendant's head start"); *see also United States v. Casteneda*, No. 18 Cr. 047, 2018 WL 888744, at *9 (N.D. Cal. Feb. 2018) (same); *United States v. Anderson*, 384 F.Supp.2d 32, 41 (D.D.C. 2005) (same); *United States v. Benatar*, No. 02 Cr. 099, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (same).

Finally, there can be little doubt that the defendant is in a position to abandon millions of dollars in cash and property securing any potential bond and still live comfortably for the rest of his life. These resources, and the ease with which the defendant could flee and live outside the reach of law enforcement—particularly considering his vast wealth and lack of meaningful ties to this District—make the risk of flight exceptionally high in this case, particularly when considered in conjunction with the strength of the government's case and the lengthy sentence the defendant could receive if convicted.

      B. <u>The Defendant Poses a Risk of Danger to the Community and of Engaging in Obstruction of Justice</u>

The release of the defendant, under any conditions, would pose a significant threat to the community and to the ongoing investigation.

As described above, where there is probable cause to believe that an individual has committed an offense under 18 U.S.C. § 1591, it is presumed that no condition or combination of conditions can reasonably assure the safety of the community. 18 U.S.C. § 3142(e)(3). Here, not only is the defendant charged with very serious sex crimes against minors, he has already previously admitted to—and been convicted of—engaging in related conduct. Specifically, in June 2008, the defendant pled guilty in state court to one count of procuring a person under the age of 18 for prostitution, a felony, and he currently is a registered sex offender, under classification level three in New York—defined as presenting a "high" risk of committing another sex crime and harm to the community. While the conduct presently alleged does not post-date the 2008 conviction, it nevertheless underscores the risk he poses to the community if released.

Additionally, and in connection with the investigation of the defendant's offense in Florida, there were credible allegations that the defendant engaged in witness tampering, harassment, or other obstructive behaviors. In fact, according to publicly-filed court documents, there were discussions between prosecutors and the defendant's then-counsel about the possibility of the defendant pleading guilty to counts relating to "obstruction," as well as "harassment," with reference to 18 U.S.C. § 1512, which criminalizes "[t]ampering with a witness, victim, or informant." For example, in a communication from the defendant's then-counsel to prosecutors in SDFL, his counsel set forth a possible factual proffer that included statements that the defendant had "attempted to harass both [redacted] delay and hinder their receipt of a [redacted] to attend an official proceeding" and that the defendant "in particular, changed travel plans and flew with both [redacted] to the United States Virgin Islands rather than to an airport in New Jersey in order to attempt to delay their receipt of what Mr. Epstein expected to be a [redacted]" and "further verbally

Honorable Henry Pitman
United States Magistrate Judge
July 8, 2019
Page 9

harassed both [redacted] in connection to this attempt to delay their voluntary receipt of process all in violation of 18 USC 1512(d)(1)."[5]  *Doe v. United States*, 08 Civ. 80736 (S.D. Fla.), Dkts. 361 at 3-4, 361-7 through 361-11.  In addition to 18 U.S.C. § 1512(d), prosecutors also proposed that the defendant could plead guilty to 18 U.S.C. § 403, that is, a knowing or intentional violation of the privacy protection of child victims and child witnesses, to which the defendant's then-counsel replied: "Already thinking about the same statutes."  *Id.* Dkt. 361-11.  They also discussed a possible obstruction plea that "could rely on the incident where Mr. Epstein's private investigators followed [redacted] father, forcing off the road."  *Id.* Dkt. 361-10.

The defendant's apparent previous willingness to obstruct a federal investigation, harass or tamper with witnesses, and hire private investigators that "*forc[ed] off the road*" the father of an individual relevant in the investigation is alarming.  It should especially weigh on the Court's consideration here because the defendant was apparently willing to take those steps *before* even being charged and thus facing federal indictment; the incentive to interfere in the Government's case here, where an Indictment has been returned, is exponentially greater.  And as discussed above, the defendant has nearly limitless means to do so.

Finally, despite having been previously convicted of a sex offense involving an underage victim, the defendant has continued to maintain a vast trove of lewd photographs of young-looking women or girls in his Manhattan mansion.  In a search of the New York Residence on the night of his arrest, on July 6-7, 2019, pursuant to judicially-authorized warrants, law enforcement officers discovered not only specific evidence consistent with victim recollections of the inside of the mansion, further strengthening the evidence of the conduct charged in the Indictment, but also at least hundreds—and perhaps thousands—of sexually suggestive photographs of fully- or partially-nude females.  While these items were only seized this weekend and are still being reviewed, some of the nude or partially-nude photographs appear to be of underage girls, including at least one girl who, according to her counsel, was underage at the time the relevant photographs were taken.  Additionally, some of the photographs referenced herein were discovered in a locked safe, in which law enforcement officers also found compact discs with hand-written labels including the following: "Young [Name] + [Name]," "Misc nudes 1," and "Girl pics nude."  The defendant, a registered sex offender, is not reformed, he is not chastened, he is not repentant;[6] rather, he is a continuing danger to the community and an individual who faces devastating evidence supporting deeply serious charges.

---

[5] The redactions above are contained in the publicly filed version of the quoted document.

[6] *See, e.g.*, Amber Southerland, *Billionaire Jeffrey Epstein: I'm a sex offender, not a predator*, N.Y. Post (2011) ("'I'm not a sexual predator, I'm an "offender,"' the financier told The Post yesterday.  'It's the difference between a murderer and a person who steals a bagel.'"); Philip Weiss, *The Fantasist*, New York Magazine (2007) ("'It's the Icarus story, someone who flies too close to the sun,' I said.  'Did Icarus like massages?' Epstein asked.").

Honorable Henry Pitman
United States Magistrate Judge
July 8, 2019
Page 10

## CONCLUSION

As set forth above, in this case, the risk of flight in this case is extraordinarily real. The defendant is extremely wealthy, has extensive foreign contacts, and is charged with serious offenses that carry a potential statutory sentence of up to 45 years' imprisonment—even a fraction of which could result in the defendant, who is 66 years old, spending the rest of his life in jail. In sum, the defendant's transient lifestyle, his lack of family or community ties, his extensive international travel and ties outside the country, and his vast wealth, including his access to and ownership of private planes, all provide the defendant with the motive and means to become a successful fugitive. Further, the nature of the offenses he is alleged to have perpetrated—the abuse dozens of underage, vulnerable girls—along with his demonstrated willingness to harass, intimidate and otherwise tamper with victims and other potential witnesses against him, render his dangerousness readily apparent.

Accordingly, the Government respectfully submits that the defendant cannot and will not be able to meet his burden of overcoming the strong presumption in favor of detention, that there are no conditions of bail that would assure the defendant's presence in court proceedings in this case or protect the safety of the community, and that any application for bail should be denied.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Alex Rossmiller / Alison Moe / Maurene Comey
Assistant United States Attorney
Southern District of New York
Tel: (212) 637-2415 / 2225 / 2324

Cc: Martin Weinberg, Esq., and Reid Weingarten, Esq., *counsel for defendant*
    Hon. Richard M. Berman, United States District Judge