```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                              19 CR 490 (RMB)

 5   JEFFREY EPSTEIN,

 6                  Defendant.
                                               Conference
 7   ------------------------------x

 8                                             New York, N.Y.
                                               July 15, 2019
 9                                             10:05 a.m.

10   Before:

11
                        HON. RICHARD M. BERMAN,
12
                                               District Judge
13
                              APPEARANCES
14
     GEOFFREY S. BERMAN
15        United States Attorney for the
          Southern District of New York
16   BY:  ALEXANDER ROSSMILLER
          ALISON G. MOE
17        Assistant United States Attorneys

18   Martin G. Weinberg, PC
          Attorney for Defendant
19
     Steptoe & Johnson, LLP (NYC)
20        Attorneys for Defendant
     BY:  REID WEINGARTEN
21
     MARC FERNICH
22        Attorney for Defendant

23   JAMES BROCHIN
          Attorney for Defendant
24
     JOSEPH JAFFE
25        Attorney for Defendant
```

1                              APPEARANCES (Cont'd)

2    Also Present:
     David Boies
3    Brad Edwards
     Paul Byrne, NYPD
4    Amanda Young, FBI

5    Bernisa Mejia, Francesca Tessier-Miller, and Dennis Khilkevich,
     U.S. Pretrial Services n}
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE COURT:  Good morning, everyone.  Please be seated.

2          For your information and for the people sitting in the

3    overflow courtroom, we have tried to accommodate everybody into

4    this proceeding either here in my usual courtroom or in the

5    overflow room.  So I hope everybody can hear me.

6          The purpose of today's proceeding, as I'm sure you're

7    all aware, is to conduct a bail hearing.  In this matter, as I

8    think you know, the government is seeking continued pretrial

9    remand of Mr. Epstein and the defense is arguing for pretrial

10   release.  The parties have submitted helpful written

11   submissions, and they have been placed on the docket.

12         You should also be aware, if you weren't -- I don't

13   think you are -- that there is what's called a pretrial

14   services report.  One has been filed with me today.

15         Typically the purpose of such a report is to make a

16   recommendation to the Court as to whether there should be bail

17   or detention.

18         There was an additional report -- I think they've

19   gotten additional information in today's report -- and the

20   representatives of pretrial services are here in the court

21   today.

22         The report itself is typically not filed on the

23   docket, but it does conclude as follows.  This is a quote.  It

24   says that "There is no condition or combination of conditions

25   that will reasonably assure the appearance of the defendant as

1  required and the safety of the community."  It goes on to

2  conclude that:  "Therefore, pretrial services respectfully

3  recommends the defendant be detained."

4        Now, of course this ultimately is the issue that I

5  have to decide and will do so with your help.

6        You should be aware, incidentally, that I have not yet

7  reached a decision on this matter, and I do not intend to do so

8  today.  I need a little bit more time to absorb everything

9  that's been submitted, and I will probably do so, that is to

10 say, give my decision here in the courtroom, on Thursday,

11 July 18, at 9:30 here in Courtroom 17B.  I will endeavor to

12 finish by then and to be able to share with you my

13 determination.

14       We also have in the court today several persons who

15 are contending that they are victims in the legal context of

16 Mr. Epstein's conduct.  They're welcome in these proceedings.

17 Indeed, they have the right to be present, and they also have

18 the right to be heard under federal law.

19       As I understand it, they have advised the Court,

20 through counsel and through the government counsel, that they

21 oppose bail for Mr. Epstein.  They may also be heard today in

22 court if they wish to be heard.

23       So for today, I thought, if this is agreeable to the

24 government and the defense, I would give each side say up to 20

25 minutes, if they wish to have it and if they do wish to be

1    heard on their respective issues.

2           The government always has the burden of proof.  So I

3    would start with them.  They made the first application which

4    was for remand.

5           I should tell you -- and I will right now -- that I

6    have some questions for each side.  And I'm going to go over

7    them with you right now so that before the government and the

8    defense speaks, they will know what questions I would like them

9    to address, if they wish to.  Otherwise, they can say whatever

10   they wish.  But these are questions that I have on my mind.

11          So the first question is this.  It involves some

12   discussion that I would like each side to address.  As you

13   know, this case involves two counts or two charges.

14          These are allegations contained in the indictment.

15   One is conspiracy to commit sex trafficking.  And the other,

16   the second count, is the substantive count of sex trafficking.

17   The referenced statute is 18 U.S. Code, Section 1591.  And for

18   our purposes, since this is a bail proceeding, also the Bail

19   Reform Act.

20          Section 1591, as is relevant here -- those cases are

21   unusual in the criminal law insofar as they carry with them a

22   presumption that "No condition or combination of conditions

23   will reasonably assure the appearance of the person as required

24   and the safety of the community."

25          As you probably know already, most cases carry a

1   presumption that bail will be granted.  That is not true with

2   respect to the charges here.

3          The presumption of remand, as in this case, may be

4   rebutted by the defense.  And if it is, the government has the

5   burden of proving that remand is nevertheless warranted.

6   Indeed, the government bears this burden of persuasion

7   throughout.

8          The burden with respect to the safety of the community

9   is clear and convincing evidence, and the burden with respect

10  to risk of flight is preponderance of the evidence.

11         The defense argues that the presumption of remand is

12  rebutted here.  And I refer to several places where they say

13  that, but one is at page 6 and following of their letter

14  application for release of Mr. Epstein.

15         So my question as relates to this burden and

16  presumption is for the defense particularly, how was the burden

17  rebutted in this case which is something that they contend

18  they've been able to do.

19         And my question for the government is whether that

20  presumption has been rebutted and, if so, how has the

21  government been able to prove remand is appropriate, if it has.

22         So here is another question.  Actually, I have a lot

23  of questions.  But the ones that are on top of my mind are

24  five.  We have all the time in the world.  So if you have more

25  questions, I'd be happy to have them answered.

1          So the question is the following:  Mr. Epstein has

2    been required to register as a sex offender in several states

3    going back I believe to 2008 when he pled guilty to an offense

4    in Florida.

5          Those states include New York, Florida, and the Virgin

6    Islands.  So one question I have for each side is what about

7    New Mexico.  That's half of the question.

8          The rest of the question is as follows:  Mr. Epstein

9    has applied in New York state to lower his sex offender status

10   from what's called a level 3, which is the highest level which

11   I think carries with it a high risk of recidivism, according to

12   these levels and to sex offender regulation.

13         And he sought to have that lowered to level 1.  His

14   application was denied, as I understand the proceedings, by the

15   Board of Examiners of Sex Offenders New York state and then in

16   state court by the courts and, particularly, a decision of the

17   Honorable Justice Ruth Pickholz on our about January 18, 2011.

18   I believe that decision was appealed to the New York State

19   Appellate Division and was unanimously upheld.

20         I read this morning a copy of the transcript of the

21   proceedings before Judge Pickholz which I'm likely to place on

22   the docket after today's session.  And the question is for each

23   side.  First of all, they're free to comment on my description

24   of the proceeding before Judge Pickholz.

25         But the question is whether there were or are other

1    legal or administrative proceedings in Florida, the Virgin

2    Islands, New Mexico, and any other jurisdiction comparable to

3    the one before Judge Pickholz in which she ruled on 1-18-2011.

4         So I'm not suggesting that there are, although I think

5    I did read someplace that there may be some proceeding pending

6    in New Mexico.  I'm not quite sure.  That's what I hoped you

7    could help me out on.

8         It doesn't have to be precisely the same proceeding

9    that Judge Pickholz had.  I'm looking for any transcripts in

10   particular and administrative or legal proceedings in other

11   states relating in any way to Mr. Epstein's sex offender

12   status.

13        The third question on my mind is this:  The defense

14   has submitted a brief financial summary to the Court of

15   Mr. Epstein's assets.  And I, as you know, permitted that it be

16   submitted under seal for, among other reasons that were on my

17   mind, not to slow the proceedings down.

18        The summary is cursory I would say, short, less than a

19   page and does not fully assist me in rendering the bail/remand

20   decision, that is to say, in its detail or absence of detail.

21   And moreover, the information provided in that summary seems to

22   be known already to the government in other ways.  They seem to

23   have gotten that information from other sources.

24        So I am inclined to place the summary on the docket,

25   but I want to hear from both sides whether I should or should

1    not do that.

2          Four, the government, as you probably know, has

3    conducted a search of Mr. Epstein's home on East 71st Street on

4    the Upper East Side a little over a week ago in tandem, as it

5    were, or in connection with Mr. Epstein's arrest.

6          The government contends in its submission that the

7    information uncovered as a result of that search supports

8    detention, pretrial detention, in this proceeding.

9          And I would like to know from the government

10   particularly what that information is and whether it would be

11   feasible -- it certainly would be helpful if there is such

12   information, that a sample of that evidence in some form be

13   included in this bail remand proceeding.

14         Lastly for now, this fifth question.  The government

15   contends that there is evidence of recent what appears to be or

16   what could be alleged witness tampering or obstruction of

17   justice in connection with two recent payments, one in the

18   amount of $250,000 and another in the amount of $100,000 to, as

19   I understand it, to two employees or associates of Mr.

20   Epstein's.

21         Those payments were made soon after a Miami Herald

22   story about this case and particularly the role of the Florida

23   United States Attorney, Mr. Acosta at the time, and the U.S.

24   Attorney's Office.

25         And I would like to hear from the government and/or

1    the defense what additional insight about this episode they can

2    share with us to support their position in these proceedings.

3           So, as all good lawyers, I reserve the right to have

4    more questions, and I probably will.

5           But I'm happy to begin with Mr. Rossmiller and have

6    you heard on the issue of remand versus bail.  If you can

7    include some or all of these questions in your presentation,

8    that would be great.

9           MR. ROSSMILLER:  Yes, your Honor.

10          Your Honor, the government seeks pretrial detention in

11   this case due to the extraordinary risk of flight and the

12   danger presented by the defendant to the community, a danger

13   that is not speculative but, rather, is evident from his prior

14   actions.  As a result, we join with the recommendation from

15   pretrial services and the requests of the victims that the

16   defendant be detained.

17          As the Court pointed out, with the sex trafficking

18   offense charged here, there is a presumption that no

19   combination of release conditions could reasonably assure the

20   defendant's appearance and the protection of the public.

21          The Court asked whether the presumption has been

22   rebutted, and the answer is no.  There has been no information

23   provided by the defendant to rebut that presumption in this

24   case.

25          And in particular, as the Court noted, the defendant

1    provided no specific detailed financial information in its

2    submission.  I'll get into that in a little bit more in a

3    moment.

4            But certainly the first question for a defendant of

5    this tremendous means is how much money does he have, where is

6    it, what are the accounts, is it in foreign accounts, how much

7    is in diamonds or art.  These are all details that would be

8    necessary for the Court to even begin to consider this type of

9    application.

10           So, no.  The presumption has not been rebutted.

11   However, your Honor, even if the defense were able at some

12   point to rebut the presumption by providing some more

13   information, there simply is no way that they can meet the

14   standard here.

15           The evaluation of the Bail Reform Act suggests that

16   all of those factors counsel in favor of remand, which we'll go

17   into in a little more detail.

18           THE COURT:  It is accurate to say that you as the

19   government has the burden of persuasion or proof in this

20   instance.  Right?

21           MR. ROSSMILLER:  Yes, your Honor.  There are good

22   reasons why sex trafficking has a presumption of detention and

23   even more so where a defendant, as this defendant has, has

24   previously been convicted of a sex offense.

25           And in connection with that, his dangerousness is

1    clear from his willingness to tamper with witnesses and victims

2    as the Court can see from the two police reports produced to

3    the Court and from the defendant's payments just months ago to

4    individuals associated with the defendant during the relevant

5    time.  The Court asked a question about that.

6          Your Honor, we just became aware of those payments

7    late last week.  We, frankly, don't have additional information

8    other than that they were paid, that they were paid to two

9    individuals who were associated with the defendant at the time,

10   and that those two individuals are both listed in the

11   non-prosecution agreement.

12         So there is certainly an inference there that the

13   defendant was attempting to influence them right around when he

14   came back into public consciousness.

15         Your Honor, the victims in this case seek detention

16   and fear his release.  And most of all, he is an extraordinary

17   flight risk.  As the government has discussed, he has six

18   homes.  He owns two private islands.  He owns a residence in

19   France.  And he has told his own financial institution that he

20   is worth more than $500 million.

21         In the government's filing last Monday, we described

22   the defendant as being extraordinarily wealthy which was

23   confirmed by the defense even in his very minimal financial

24   disclosure.

25         Since the government's initial filing, we have

1  obtained records from a financial institution that has been

2  associated with the defendant confirming that the defendant

3  represented his net worth as more than $500 million.

4  Your Honor, just as one example, the defendant had a single

5  account at that financial institution totaling more than $110

6  million.

7          There can be no dispute whatsoever that this defendant

8  has vast assets and every incentive in the world to use those

9  assets to flee from justice.

10         Your Honor, the government seeking detention in this

11  case is not unusual.  Defendants are routinely detained in this

12  district when facing such charges, and this defendant should be

13  treated no differently.  The fact that he has considerable

14  resources to flee prosecution only makes the case for his

15  detention stronger.

16         On that note, with respect to the strength of the

17  evidence, again, last Monday, the government described its

18  evidence as "strong."  Just a week later, after seven days of

19  this case being public following months of a covert

20  investigation, the evidence is already significantly stronger

21  and getting stronger every single day.

22         Many individuals identifying themselves as victims and

23  witnesses have contacted the government, and we are in the

24  process of receiving and corroborating this additional

25  evidence.

1        Your Honor, with a case that's no longer covert, we

2   have been able to dramatically expand the scope of our

3   investigation in just the last week.  And that additional

4   evidence builds on a case that was already indicted by a grand

5   jury, that already included evidence of dozens of alleged

6   victims, that already included significant corroborated

7   evidence, evidence that led to the charges for which this

8   66-year-old defendant could serve up to 45 years in prison.

9        The defendant has essentially conceded that the

10  government will be able to prove the elements of the crimes

11  currently alleged.  They acknowledged in their submission that

12  the government likely will be able to show that the defendant

13  engaged in sex acts for money with girls he knew were under

14  age.

15       Now, in the face of all of this evidence and the

16  extraordinary incentives for the defendant to flee, what does

17  the defendant propose?  Nothing that would meaningfully

18  mitigate the risks of danger and especially flight.

19       THE COURT:  Are you talking about the bail package

20  now?

21       MR. ROSSMILLER:  Yes, your Honor.

22       So in the first instance, the defendant's one-page

23  financial disclosure form is more significant for what it does

24  not include than what it does.  It is cursory, as the Court

25  said, at best.

1      It does not include a list of accounts.  It does not

2  include a list of financial institutions.  It does not identify

3  what types of currencies the defendant holds.  It does nothing

4  to identify the location of his holdings.  It does nothing to

5  identify high-value property such as diamonds or art, both of

6  which were observed in abundance in just the government's

7  search of his Manhattan mansion.

8      The other thing, your Honor, is we're just relying on

9  the defendant's word for all of this.  This is not sworn.  It's

10  not under penalty of perjury.  There are no account statements.

11  There are no bank records.  There is nothing to validate this.

12      That's not to say that if this were validated, that

13  this would somehow rise to the level of being granted bail, but

14  it's notable with respect to the presumption in particular and

15  also with respect to how the Court evaluates the defendant's

16  assets that we are relying on him.

17      The defendant's financial disclosure form should alarm

18  the Court, your Honor, not give it comfort that there are

19  conditions that would keep the defendant from fleeing and

20  prevent him from being a danger.

21      With respect to the proposed package, the defendant

22  proposes the Court accept his Manhattan mansion as security for

23  a bond.  Now, the government has already designated that

24  property for seizure making it worthless to the defendant.  He

25  proposes cosigners who couldn't possibly secure a package

1   representing even a fraction of his wealth.

2            THE COURT:  I don't know that we know that because we

3   don't really know what their financial situation is.

4            MR. ROSSMILLER:  I suppose that's true, your Honor.

5   Based on the government's preliminary research, it seems like

6   they wouldn't be able to, but we have no idea.  That's exactly

7   right.

8            The defendant's proposal of home confinement and

9   electronic monitoring is also meaningless for an individual

10  with his financial resources.  Reducing this defendant's head

11  start in fleeing should be of no comfort whatsoever.

12           In connection with that factor, your Honor, just this

13  morning, the government became aware that in a locked safe in

14  the defendant's mansion there were piles of cash, dozens of

15  diamonds, and a passport appearing to be issued from a foreign

16  country with a photo of the defendant and a name on that

17  passport that is not the defendant's name.

18           THE COURT:  Say that again.

19           You found that today?

20           MR. ROSSMILLER:  We became aware of it today.  It was

21  seized in connection with a warrant, and we became aware of it

22  just this morning, the particular details this morning.

23           THE COURT:  When you say "piles of cash," did you

24  count it?

25           MR. ROSSMILLER:  No.  We have not counted the cash,

1   your Honor.  It does raise the question of how many other safes

2   are there in how many other locations with items like these.

3          The defendant also makes proposals that highlight,

4   rather than mitigate, the dangers of granting bail.  His offer

5   to consent to extradition is unenforceable, and it highlights

6   his extensive connections abroad.

7          I should say, your Honor -- I forgot to mention -- the

8   passport that I just referenced listed at the time his

9   residence as Saudi Arabia, and this was from the 1980's.

10          THE COURT:  Would you describe that passport again.

11   I'm not sure I caught it.

12          MR. ROSSMILLER:  I can, your Honor.

13          The passport was issued in the name of a foreign

14   country.  It appears to have been issued sometime in the

15   1980's.  It is expired currently.  It has a photo that appears

16   to be the defendant, and it has a name that is not Jeffrey

17   Epstein.

18          In connection with that, I also want to note that the

19   defendant's proposal for private security is inadequate and

20   impractical and would put the defendant in the position of

21   having complete financial control over the people who are

22   supposed to guard him.

23          As this Court has written:  "What more compelling case

24   for an order of detention is there than a case in which only an

25   armed guard and the threat of deadly force is sufficient to

1   assure the defendant's appearance."So that's just on flight,

2   your Honor.

3          With respect to danger to the community, none of the

4   defendant's proposals address the very significant danger this

5   defendant proposes, both to victims and witnesses and to the

6   proper administration of justice.

7          The government has heard from more than one victim

8   that in connection with the prior investigation, they believed

9   they were being instructed by the defendant or his associates

10  to avoid or lie to law enforcement.

11         The defense said in its submission that it was without

12  knowledge as to the basis of the incidents referenced by the

13  government in our initial filings.

14         So, as the Court saw, we submitted the underlying

15  police reports.  Those police reports are detailed, they're

16  credible, and they're supported by corroborating evidence such

17  as phone records.

18         THE COURT:  These are from Florida; right?

19         MR. ROSSMILLER:  That's correct, your Honor.  These

20  are very real concerns, and they cannot be mitigated if the

21  defendant is released.

22         And as the government noted in its submission and as

23  the Court asked about, even recently the defendant has sent

24  hundreds of thousands of dollars to two individuals just days

25  after the publication of significant news articles about the

1    defendant.

2           THE COURT:  Could you go back to those Florida police

3    reports and tell us what you think they demonstrate.

4           MR. ROSSMILLER:  Yes, your Honor.

5           They certainly suggest that there were individuals who

6    believed that they were being harassed and interfered with by

7    the defendant or his agents.  That was investigators or other

8    individuals working on behalf of or at the behest of the

9    defendant.

10          Now, those aren't charges proven in court.  Those

11   aren't convictions.  But they certainly are factual occurrences

12   that people reported contemporaneously and that are significant

13   and concerning.

14          With respect to just a couple of the Court's

15   questions, bouncing around just slightly, with respect to the

16   financial information which, again, is limited at best, the

17   government took no position on the defendant's sealing

18   application for, among other reasons, the fact that we did not

19   know what they were going to submit.  We imagined that it would

20   be more detailed.

21          Secondly, the government obviously had just hours to

22   respond to the defendant's at that point.  So we took no

23   position and of course defer to the Court as to whether there

24   is a valid reason to seal such limited and summary information.

25          We will confer, your Honor, on whether we're able to

1    provide a sample of the search warrant materials.  Those

2    materials remain under review.  They are, generally speaking,

3    many, many, many photographs of nude and partially nude women

4    and girls who appear to be young.

5           The government has identified at least one individual

6    in those photos who has self-identified as a victim of the

7    defendant.  And, frankly, it is a lot of material that we are

8    continuing to work through.

9           With respect to the sex offender registration of the

10   defendant in other states, your Honor, following up on the

11   Court's question last week, we did confer with New York state

12   authorities.

13          There is no particular result from this case in terms

14   of his registration in New York.  He remains registered, but

15   there is no specific consequence as to him being charged or

16   arrested in this case and no change of his status.  He is

17   already, of course, at the highest status of risk for

18   re-offense.

19          Just very briefly, your Honor, with respect to some of

20   the other arguments that defense counsel made --

21          THE COURT:  Are you familiar with whether or not there

22   are other proceedings in other jurisdictions of a similar

23   nature to Judge Pickholz's decision?

24          MR. ROSSMILLER:  We are not aware of any similar

25   proceedings.  That's not to say that there aren't any, but the

1  government is not aware of any at this time, your Honor.

2       Now, turning just very briefly to some of the legal

3  arguments that defense counsel raised in their submission, the

4  defendant raised legal arguments that he says he intends to

5  argue later.

6       The Court should have no confidence whatsoever that

7  the defendant would stick around to pursue long-shot, dubious

8  legal arguments at some future time.  As set forth in the

9  government's submission, the non-prosecution agreement does not

10 preclude this prosecution.

11      And even if that agreement were applicable to this

12 district, which it is not, the defense itself acknowledges that

13 the indictment included evidence beyond the initial

14 investigation.  That effectively moots this issue for the bail

15 argument.  This case will go forward.

16      The defendant will lose any argument about due

17 process.  He will lose any argument about pre-indictment delay.

18 And if he choses to be tried before a jury of his peers, we are

19 confident he will be convicted.

20      The Court should ensure he is here when that time

21 comes by ordering his detention.

22      THE COURT:  Counsel.

23      MR. WEINBERG:  Thank you, your Honor.

24      If I can, your Honor, before responding to the Court's

25 questions, put this case in some context.

1          Before 1984, before the Bail Reform Act, there was an

2    Eighth Amendment that the United States Supreme Court

3    guaranteed bail to anyone who wasn't charged with a capital

4    offense, and the justices wrote continuously that was because

5    detention impairs a defendant's ability to prepare a defense.

6          In this case, the government has told us there's going

7    to be an enormous amount of discovery.  The stakes are grave,

8    and one of the most important reasons for Mr. Epstein's release

9    is to permit him the right to fully prepare a defense.

10          The second reason that before 1984 there was an

11    entitlement to bail was because of the presumption of innocence

12    and because of the basic premise of the American criminal

13    justice system that you don't punish first and have a trial

14    second; that non-convicted citizens don't get detained which is

15    essentially a label for punishment.

16          There is no way to replace the freedom if Mr. Epstein

17    is to prevail on these charges.  If the government's over a

18    decade of delay is found prejudicial by the Court which

19    thereafter dismisses the charges, if the Court determines that

20    the nonpros agreement was circumvented by the prosecutors in

21    Florida when they encouraged their witnesses and their

22    witnesses' lawyers to go to the Southern District and catalyze

23    and create a case.  That's unique.

24          These were not two silos, the Southern District of

25    Florida and the Southern District of New York.  It is more than

1    coincidental that on the Saturday before the Monday filing by

2    Mr. Epstein in Florida in the CVRA case Mr. Epstein is

3    arrested.

4              We have evidence not only of an enormous amount of

5    overlapping evidence, but we have evidence of the involvement

6    of the Department of Justice; the CEOS unit, the Child

7    Exploitation Unit, both before the nonpros agreement was

8    executed, they were involved with the Southern District of

9    Florida.  And after, they volunteered essentially to be part of

10   a team in the event that Mr. Epstein did not conclude his

11   obligations under the CVRA.

12             THE COURT:  You mentioned in your submissions -- and I

13   think you mentioned or your colleague mentioned the last time

14   that we were in court -- that high-level Department of Justice

15   officials approved the non-prosecution agreement.

16             MR. WEINBERG:  Yes, your Honor.

17             THE COURT:  Who are they?

18             MR. WEINBERG:  First, the agreement was executed on

19   September 24, 2007.  Appeals were taken by Mr. Epstein

20   challenging the federal interest in what was a potential state

21   prosecution.

22             The first level was the criminal division.  The head

23   of the criminal division, Alice Fisher, assigned to Sigal

24   Mandelker.  I may be mispronouncing her name, but she is the

25   current Undersecretary of the Treasury.

1          She received submissions from the defense that this

2   was essentially a local crime without the necessary interstate

3   elements that constitute the foundation of federal prosecution.

4          We had a meeting in Washington with a number of the

5   defense team with representatives of the criminal division and

6   the representatives of the CEOS, the Child Exploitation Unit.

7          They recognized that their position was not squarely

8   within the precedence that had preceded this March 2008

9   meeting.  They recognized the arguments were novel; that some

10  of the provisions in the NPA were novels.  But they endorsed

11  the exercise of prosecutorial discretion that was at the heart

12  of the NPA.

13          THE COURT:  Was there any proceeding at which their

14  position is documented or any correspondence?

15          MR. WEINBERG:  Yes, your Honor.  There are submissions

16  by the defense to the criminal division in Washington that I

17  believe were dated in March.  And then there was a response in

18  May which in essence authorized --

19          THE COURT:  May of what year?

20          MR. WEINBERG:  May of 2008.

21          THE COURT:  What did it say?

22          MR. ROSSMILLER:  It endorsed the exercise of

23  discretion after recognizing in about a six- or seven-page

24  letter that the facts and circumstances surrounding the NPA

25  were unusual; that these allegations were not within the

1    heartland of federal jurisprudence or the federal statutes that

2    were targeted for Mr. Epstein.

3         THE COURT:  They actually said that and then endorsed

4    the agreement --

5         MR. WEINBERG:  They said that they were unusual

6    arguments; that they essentially understood the arguments we

7    were making.  They didn't denounce the federal case.

8         They, instead, said that they believed, after a

9    review, that there was authority and that there was a

10   sufficient discretion that should be accorded to the U.S.

11   Attorney.

12        An appeal was then taken to the Deputy Attorney

13   General who at the time was Mr. Filip, F-i-l-i-p.  Again, I may

14   be butchering his name.

15        THE COURT:  That's his last name?

16        MR. ROSSMILLER:  That's his last name.  Mark I think

17   is his first name.

18        He assigned John Roth, who was a former Florida

19   prosecutor and was his deputy or the deputy to the Deputy

20   Attorney General.  And Mr. Roth received further written

21   submissions.  Again, there was the second endorsement of the

22   discretion that Mr. Acosta in Florida exercised when he

23   approved.

24        And this was not a single-man approval.  The

25   negotiations in the Southern District of Florida included the

1    head of the first assistant, Mr. Sloman.

2              THE COURT:  In New York.

3              MR. WEINBERG:  Right.  In the Southern district, there

4    were six or seven prosecutors, including New York City

5    prosecutors, in what was either the largest or second largest

6    U.S. Attorney's Office.  I don't know how the manpower compares

7    to the Southern District of New York.

8              This was well thought through.  Again, it was with

9    consultation of the Department of Justice before September 24

10   and then again after where the government continued to

11   investigate.

12             THE COURT:  Is Mr. Filip the highest level official in

13   the Department of Justice?

14             MR. WEINBERG:  Yes.  He was just one step below the

15   Attorney General.

16             THE COURT:  He was Deputy Attorney General?

17             MR. WEINBERG:  Deputy Attorney General.

18             In May or June of 2008, he approved the discretion to

19   enter the NPA and to essentially endorse the decision and

20   implicitly endorsed that there was some federal interest in

21   this case because we were contesting whether or not this was a

22   case that warranted the weight of the federal government which

23   required Mr. Epstein to go to the state which had returned an

24   indictment for solicitation and actually urged the state of

25   Florida to bring a second charge that would subject Mr. Epstein

1    to registration which was part of the obligations that he

2    accepted, and no one quarrels with his performance.

3           He went to the state.  They returned the higher

4    charge.  He went to jail.  He did his strict probation with

5    home detention.  And he's been registered since 2010.

6           I think these facts are important, not just because

7    they are the cornerstone of a potential legal defense, and I

8    won't go through all of the different factors that we believe

9    on a principal basis will distinguish this case from the

10   precedence that Mr. Rossmiller is relying on.

11          These were not two silos.  The Southern District

12   didn't stand completely detached from the activities and the

13   events in Florida.  But that's a motion to dismiss that will be

14   brought later.  The premise is if we're right and they're wrong

15   and he's detained, he's lost freedom without punishment.

16          Your Honor asked about the rebuttable presumption, and

17   I think this also goes back to the events of the 2007 and 2008

18   era.

19          THE COURT:  So the presumption, first of all, the

20   people who wrote that presumption into law clearly know about

21   bail and history and the need for defendants to consult with

22   their counsel, etc.

23          But in this rather narrow class of cases, almost all

24   of them I think relating to children or young people, there are

25   a whole series of cases, exceptions to be sure, where the

1   presumption of remand maintains.  And this is one of those

2   cases.

3           MR. WEINBERG:  Yes, your Honor.

4           THE COURT:  So why is that?

5           MR. WEINBERG:  Interestingly, if I can point out

6   another provision in the Bail Reform Act, and this is 3142(c).

7   At the very end of the set of conditions, the Congress in 1984,

8   which was essentially revolutionizing the criteria for release,

9   says that:  "In any case that involves a minor victim under" --

10  and they quote a series of statutes, including 1591 -- "any

11  release order shall contain at minimum a condition of

12  electronic monitoring, a curfew, and other conditions."

13          So Congress recognized that despite the presumption,

14  which the law says is rebuttable and is more a burden of

15  production than an ultimate burden of persuasion issue,

16  Congress understood that defendants charged with 1591 would be

17  released under conditions at the discretion of the court and

18  that if they were --

19          THE COURT:  I think they understood that they could be

20  released, not that they would be, otherwise, they wouldn't have

21  written that presumption.

22          MR. WEINBERG:  Absolutely.

23          THE COURT:  So could you share any insight why,

24  notwithstanding -- and I don't disagree with you.  Bail is the

25  norm rather than the exception.  But we totaled up -- I don't

1    know if there are more -- 12 cases, all of which involve a

2    minor victim -- kidnapping, sex trafficking of children,

3    aggravated sexual abuse, sexual abuse, offenses resulting in

4    death, sexual exploitation of children, selling and buying of

5    children, the production of sexually explicit depictions of a

6    minor for importation into the United States, crimes involving

7    the transportation of minor victims, coercion and enticement,

8    transport of minors, and use of interstate facilities to

9    transmit information about a minor.

10           All of those -- there may be others, but those are the

11   ones we found -- also carried this presumption of remand

12   instead of bail.

13           MR. WEINBERG:  Yes, your Honor.

14           THE COURT:  Presumption.

15           MR. WEINBERG:  Yes, your Honor.  If we're looking at

16   1591 -- and I'm not here today to in any way diminish the

17   gravity of the allegations against Mr. Epstein, but it's far

18   away from the heartland of 1591 commercial sex trafficking that

19   deals with servitude and deals with enslavement and deals with

20   pimps, if I can use that word, selling women for commercial

21   profit.

22           We've provided the Court with some of the division in

23   the law, including decisions by this Court, by Judge Jones

24   relying on a South Dakota opinion, by the chief justice that

25   finds the statute inapplicable.

1          THE COURT:  Is that the *Fiaro* (phonetic) case?

2          MR. WEINBERG:  Yes, your Honor.  Again, today is not

3    the day to be arguing Rule 29 issues or even the construction

4    and scope of the statute.  But I think lots of the detentions

5    are for your quintessential traffickers.

6          And I understand we don't have consent and, therefore,

7    the government substitutes that language.  But this is not

8    quintessential commercial sex trafficking to third parties for

9    profit.

10          But more important or as important, if I can say that,

11    the presumption is rebuttable.  Even in those cases that

12    your Honor listed, the statute contemplates that some 1591

13    defendants will be released under conditions, and I believe

14    that the rebuttal to the presumption -- one is the danger

15    prong; one is the flight prong.  If I can address them

16    separately.

17          THE COURT:  Sure.

18          MR. WEINBERG:  I apologize if I'm using the time.

19          THE COURT:  No.  You have the right.

20          MR. WEINBERG:  Thank you, Judge.

21          THE COURT:  I think that is interesting.  So those

22    prongs have different burdens of proof for one thing, clear and

23    convincing in one instance and preponderance in the other.

24          It's either/or or both one could find.  But if one

25    found one of those, either a danger to the community or flight

1   risk, that would suffice.

2          MR. WEINBERG:   I think I have to bear the burden of

3   rebutting the presumption as to each prong, although I think

4   once rebutting the burden falls on the government, and then

5   they have different substantive burdens of proof.

6          So danger.   There are two categories of the dangers

7   that have been identified by the government.   Number one is

8   simply the danger of recidivism which is the classic danger

9   that results in detention when detention is predicated on

10  danger.

11         And Congress was very clear that they -- because the

12  danger prong is predictive.   It is not just was he a bad guy.

13  Did he do things in the past.   That's what a trial is for.

14  That's what legal issues are for.   It's can we infer from the

15  past that he is a future danger and can we do it by clear and

16  convincing evidence.

17         In terms of rebutting and the burden of production as

18  to that part of the danger prong, 14 years, since 2005 until

19  2019.   And the government, despite a website, despite their

20  enormous ability to investigate -- and they've been

21  investigating for months -- there is no allegation that

22  Mr. Epstein, after 2005, engaged in illegal sexual activity

23  with a minor.

24         Again, I'm not diminishing the gravity of the

25  allegations in 2005 and 2004, but once he knew that he was

1    being investigated, he wasn't a predator that couldn't control

2    his conduct.  He disciplined himself.

3          There has been no allegation since the commencement of

4    that investigation that Mr. Epstein again endangered a minor.

5    Putting aside consent, there is just no allegation.

6          The witnesses that Mr. Rossmiller will offer to the

7    Court in the future, at least to the extent that they've been

8    characterized by the government, are more witnesses with a kind

9    of a parallel group of witnesses to the 2002 and '05

10   allegations.  So I think a 14-year gap is an eloquent rebuttal

11   to a burden of production presumption as to danger.

12         THE COURT:  So I have a question about that too

13   because I'm not so sure.  I don't purport to know, but I'm not

14   so sure.

15         So in your letter to the Court -- I think it's at page

16   6 -- is one of a series of strong statements.  This one in

17   particular says:  "Any danger that Mr. Epstein may have once

18   posed to the community has long since abated."  Another

19   sentence used the word "evaporates," but let's say "abated."

20         The defense submission goes on to say:  "At the very

21   least, this enormous gap in time precludes a finding,"

22   "precludes a finding by clear and convincing evidence that no

23   conditions of release can reasonably assure the community's

24   safety."

25         Right?  That's your position as a matter of law.  You

1    don't find any case where that says 14 years, and it's over or

2    it evaporates, etc.

3         The argument though is that 14 years ought to be

4    enough of a period of time.  Right?

5         MR. WEINBERG:  I think the premise is that when the

6    man was not under conditions of release, if your Honor was to

7    exercise your power to release him, he didn't re-engage in this

8    activity that constitutes the heart of both the Florida and the

9    current New York prosecutions.

10        And at a certain point, when you're dealing with the

11   government's burden to prove by clear and convincing evidence

12   going forward in the future, the idea that he would abandon his

13   14 years of self-discipline when he's under conditions of bail

14   that can result in his rearrest and re-detention -- I don't

15   think the government can carry that weight or carry that

16   burden.

17        THE COURT:  So I'm very interested in this question.

18   It's a very interesting question.  As you may or probably know,

19   there are studies of recidivism, studies of recidivism directly

20   related to sex offenders.

21        I'll share with you what I've looked at because I

22   don't want you to think I'm researching on my own anything that

23   you are not aware of.  These are, I think, government-supported

24   studies that measure recidivism beyond 10 or 14 or 15 years and

25   that purport, if I read these studies, to show that the nature

1   of recidivism is not always that, oh, I'm not going to do this

2   conduct anymore.  It's more of a psychological aspect I would

3   say.

4              But they measure recidivism rates -- for example, one

5   study that I saw -- and I'll put this up on the docket so

6   you'll know what I was looking at -- measures recidivism at

7   five years, at ten years, and at fifteen years.

8              And the response, the percentage of recidivism

9   actually goes up at 15 years.  I'm not going to quote the

10  percent.  I know it, but I don't know how accurate it is, but

11  it is substantially higher than the recidivism rate at five

12  years, for example.

13             So all I'm saying is I don't think it's so clear that

14  with the passage of time, the presumption, so to speak,

15  evaporates or disappears.

16             There is other discussion in some of these studies

17  that sex crimes are the most difficult to evaluate in relation

18  to recidivism and a lot of other concepts because in sex

19  crimes, victims very often don't come forward.

20             This is not a phenomenon when we hear in this case or

21  even in another case on the news that where was the victim

22  then, didn't come forward.  That's not an uncommon phenomenon

23  having to do with a whole complex number of factors.  So a lot

24  of these cases are never reported.

25             I don't know that you can just draw the conclusion

1    that -- by the way, you're suggesting that the measure of

2    recidivism is a reported classic case by the prosecutor, state

3    or federal, indictment, etc., etc.

4            That may not even occur in most instances because a

5    lot of cases that are even referred to prosecutor offices are

6    never formalized or never brought.

7            So I'm not sure that the passage of time, without more

8    and without more study and with let's say discipline of a

9    defendant -- I'm not sure that that gets us there.

10            MR. WEINBERG:  I guess I would have two responses.

11            THE COURT:  Sure.

12            MR. WEINBERG:  One, that the level of publicity

13   brought to Mr. Epstein and brought in this case and even

14   brought before the bringing of this case, his wealth which

15   makes him an attractive civil defendant as well as a criminal

16   defendant -- and there have been a number of complaints or

17   threats or notices or demands by different civil lawyers.

18            But there is an unprecedented amount of publicity that

19   would mobilize and motivate people who were victimized by him.

20   If there were any people victimized by him after 2005, it is

21   utterly lacking in the average case where some victim doesn't

22   know that they've got an ear, whether it's an ear of the civil

23   bar or an ear of the United States Attorney, to receive,

24   positively receive, and embrace an allegation against

25   Mr. Epstein.

1          And, two, again, without getting into in any way of

2    appreciating the gravity of these charges, the government

3    writes on page 2 of its submission, this was not a case --

4    again, putting the age of these witnesses and putting the

5    consent issue aside, it's not like he's an out-of-control

6    rapist.

7          He doesn't fit within the paradigm of many of the sex

8    offenders that are the subject of the research that your Honor

9    is accessing.

10          THE COURT:  And I don't mean this personally directed

11   because I don't have any way of knowing one way or another of

12   Mr. Epstein, but the question is:  How do you know that?

13          MR. WEINBERG:  I know that because --

14          THE COURT:  You may say, he's my client, and I know

15   he's a good fellow and all that.

16          MR. WEINBERG:  I actually do think that if he was

17   unable to control his conduct, given the level of publicity,

18   we'd know it.  The government would know it.

19          But secondly, these 15 years have not been uneventful.

20   I think this goes also to rebut the notion that he is a flight

21   risk.  His house was searched in 2005 giving him notice that

22   the state authorities were conducting an investigation.

23          It was an intensive investigation.  It led in 2006 to

24   the U.S. Attorney's investigation that itself was intensive.

25   There were grand jury subpoenas.  There was an enormous amount

1   of attention by the FBI.

2          He didn't flee.  This was all before the NPA while he

3   was facing the very same 1591 and even additional statutes that

4   carried additional potential federal penalties, interstate

5   travel, interstate communications.

6          Again, we have to infer from the past what the future

7   conduct would be.  I think it's important that he hired lawyers

8   to defend him.  He didn't run away.

9          Despite the fact there was no bail, no conditions, he

10  didn't have the publicity he has now, he could have, if he was

11  a fleer, left at that time and done what the government fears

12  he would do today if released under an enormous set of

13  conditions that I will ask to supplement.

14         Two is the next period was the NPA period.  Again, he

15  signed up to go to state jail, county jail.  He went to county

16  jail.  He got out in 2010.  He was subject to the

17  registrations.

18         And if I can go back in to try and answer your Honor's

19  questions on registration.  He has not reapplied challenging

20  the New York Appellate Division or the New York Supreme Court

21  decision.

22         There was a legal dispute.  Mr. Epstein's counsel at

23  the time believed that the classification in New York should be

24  restricted to the offense of conviction.  And the Court

25  determined that it would rely instead on an affidavit that it

1    had presented in the state of Florida that talked about other

2    allegations leading to the tier three classification.

3              New Mexico, as I understand it --

4              THE COURT:  Before you get to New Mexico, the court,

5    as I read -- and I did this morning.  So it's fresh in my

6    mind -- Judge Pickholz -- she relied on the state

7    administrative body that imposed, so to speak, or who in the

8    first instance said that a level 3 was the appropriate level,

9    after considering the series of factors which are reflected in

10   this transcript.

11             You know, judges often do just that.  She says in this

12   transcript that she's had many of these cases.  They're called

13   SORA hearings.  I must say it's -- I don't know what the word

14   is I'm looking for, but you'll read it yourself.

15             She was taken aback I have to say, really taken aback,

16   Judge Pickholz was, that this application was being presented

17   to her.  She says things like, I have never even the

18   prosecutor's office do this.  So the prosecutor joined in with

19   defense counsel.  I think Kirkland & Ellis and the ADA from

20   Vance's office joined together, and they both argued for

21   lowering the offense level from a 3 to a 1.

22             She says a few things like that which are pretty

23   unusual for a judge to say, in effect -- first of all, she said

24   the board made a recommendation.  And second, she seemed to be

25   suggesting that this was unique.

1     The prosecutor, the DA's office, and the defense

2     joining together in making such an application is very unusual

3     I think is what she said.  And then on appeal, I think it was

4     affirmed 5 to 0 actually.  They sit on panels of five.  So I

5     was surprised.

6     MR. WEINBERG:  It was, to my recollection, a legal

7     issue about whether or not the premise for a classification

8     decision should be the offense of conviction which would have

9     been consistent with a tier 1 or the overall investigation as

10    reflected by a probable cause affidavit that ultimately six

11    judges, the five on the appellate division and one on the

12    Supreme Court, believed was the appropriate barometer of sex

13    offender registration.

14    What's important is that Mr. Epstein has complied with

15    the registration imperatives of each state of his residence.

16    He's got the unusual circumstance of having multiple

17    residences.

18    His principal residence is the Virgin Islands which

19    has him at a tier 1 or the lowest level of classification.  New

20    Mexico he tried to register, and my understanding is that they

21    said that his nexus to the state did not require further

22    registration because his travels, his daily occurrences, were

23    being monitored by his principal residences.

24    THE COURT:  That goes back to the question I have, but

25    before I get there, we've gone far along.  Normally by this

1   time I would have said -- and I will say it now -- as you

2   pointed out, what I said the other day at our conference is

3   that when we get to the bail issue, we're going to have

4   conversations and discussions that sound like merits

5   discussions, and they aren't.

6          And I very much agree with you that the presumption of

7   innocence everybody has to bear in mind, although sometimes

8   it's a little difficult when we have these conversations to

9   separate them out.

10          It's just fundamental that Mr. Epstein is presumed to

11   be innocent now and until such time, if it comes, that a jury

12   or a court makes a determination of guilt.  So we always have

13   to remind ourselves of that, even though we're having these

14   conversations that seem to touch on merits discussions.

15          Back to Judge Pickholz, she says, among other things,

16   but the board found a level 3.  Then she goes on to say:  "I

17   have to tell you, I'm a little overwhelmed because I have never

18   seen the prosecutor's office do anything like this.  I have

19   never seen it."

20          So I read it today.  It came up, and I thought I'd

21   share it with all of you.  She's suggesting, although you're

22   making plausible legal arguments, that there is really no

23   basis, at least in her opinion, to reduce the level from level

24   3 to level 1.

25          What is the practical difference between a 3 and a 1

1   in terms of the registrant's obligations to appear or submit

2   reports or whatever?

3           MR. WEINBERG:  I don't think I can reliably respond

4   except to say that there was some discussion about whether or

5   not he was required to physically appear in New York.

6           And my understanding from the lawyers with personal

7   knowledge is he was told that unless he was here nine or more

8   days a month, he was not required to conform to the physical

9   90-day appearance, despite being a tier 3.

10          THE COURT:  He wouldn't have to come.

11          MR. WEINBERG:  Right.  Nobody has ever given him or

12  noticed a violation in almost ten years of daily monitoring.

13  He's not someone that just stays at one location.

14          I've got a stack from one of his lawyers that I won't

15  burden the Court with about putting on record with the Virgin

16  Islands, which is the principal monitor of his travels every

17  day, what is the transportation, where is he going to be.  I

18  see letters saying, we're delayed one day.  We'll be coming

19  into Palm Beach on a certain day.

20          The point being, I think, two:  One, there's been no

21  violation in nine years; that he's being carefully monitored.

22  He himself is extraordinarily careful not to trigger a federal

23  SORA or a state SORNA violation, and he hasn't.

24          Two, I think that speaks to his ability to be

25  disciplined, his ability to regulate his conduct consistent

1   with the mandates, whether it's an administrative agency or a

2   court's bail release order.

3          Three, I know of no other proceedings, in answer to

4   the question your Honor asked -- I think it was question two --

5   like the proceedings in New York.

6          I will verify that with the counsel in the different

7   jurisdictions who can provide primary rather than secondary or

8   hearsay evidence so we can give you in an additional submission

9   some meaningful and particularized responses to your Honor's

10  questions of this morning.

11         THE COURT:  That would be helpful.

12         There are two things.  One is another disclosure on my

13  part.  I did happen to read in the New York Post a story about

14  the New York state sex offender registration.

15         The thrust of that story was that Mr. Epstein -- or at

16  least it appeared to me to be the thrust -- was not in

17  compliance with his obligations in New York.

18         Again, it's a newspaper story.  I did see it.  I share

19  it with you.  You probably saw it too.

20         MR. WEINBERG:  I think I did.  I think that's where I

21  checked with counsel, and that's where I learned of this

22  nine-day rule which I was not familiar with before checking.

23         But what I can say is nobody on the New York side has

24  ever informed Mr. Epstein, despite the now ten-day deluge of

25  publicity, that he has ever been in violation.

1          There has been no notice to his New York counsel.  And

2    he has done everything in his power to meticulously conform to

3    these multiple registrations and inform, through the Virgin

4    Islands, of travel whether it's to Paris, whether it's to

5    Florida, whether it's to New York.  I don't think there is a

6    complaint in nine years that he has been in violation.

7          THE COURT:  So is the point or one point that if he is

8    not here for ten consecutive days or more, he does not have to

9    report?

10         MR. WEINBERG:  Again, I don't want my credibility

11   resting on what I haven't personally verified.  I am told that

12   that is the criteria for physical appearance, whether that's

13   correct or not.

14         I can tell you that from talking to counsel, there has

15   been no notice that he should appear and no notice that he's

16   been in violation, despite the recent media.

17         THE COURT:  When you put together the supplemental

18   submission particularly about New Mexico, it was hard for me to

19   imagine, would New Mexico reach out to someone and say, oh, you

20   don't have to register here?

21         Or was there some form of application to be exempt or

22   excused?  I don't know for sure.

23         MR. WEINBERG:  My best knowledge is that registration

24   kicks in when your criminal justice sentence ends.  Therefore,

25   as soon as he was within weeks or months of ending the Florida

1     probation or community control part of the Florida state

2     sentence, he tasked lawyers to go to these different

3     registration boards in the states where he had residence.

4              It was complicated because of the multiple residences.

5     And the ultimate decision in New Mexico -- and I can't tell you

6     whether there was a period where he did register, but I can

7     tell you that at a point in time very close to the beginning,

8     New Mexico said, you don't need to register.

9              I know he made an effort to register because the

10    concern was that the federal registration statute requires that

11    you contact the states where you reside.

12             It was complicated because of the multiple residences,

13    and the last thing he wanted to do was to create a new offense

14    through an omission of the obligations under the federal SORNA.

15             So he went to New Mexico.  And I will particularize

16    the names of the people and the names of the lawyers, but he is

17    not required to register.  New Mexico knows he's there because

18    the Virgin Islands tells the different places where he travels

19    that he's coming.  He's under close supervision.

20             THE COURT:  I got it.

21             I think I sort of assumed something like that, that

22    counsel in different jurisdictions would have had a meeting or

23    filed an application or a letter or something or rather causing

24    the administrative agency to respond.

25             This is really now stretching my recollection.  I

1    thought I read in all of these papers somewhere that New Mexico

2    was examining its decision that he needn't be registered in

3    that state.

4              MR. WEINBERG:  It may be.  And if they advise that he

5    is to register --

6              THE COURT:  He would I'm sure.

7              MR. WEINBERG:  -- it is just an incremental additional

8    registration obligation because he's under so many in Florida,

9    New York, and the Virgin Islands.

10             The so other part of danger -- and I apologize.  I

11   will get to flight --

12             THE COURT:  No apology needed.

13             MR. WEINBERG:  -- is the government allegation that as

14   a result of the incident reports in Palm Beach dating back to

15   2006 that Mr. Epstein is a danger to others and should be

16   detained.

17             What I would respond to that is that the report -- and

18   I showed Mr. Rossmiller a slightly better, unredacted version

19   of page 86 of an incident report of Detective Recarey from the

20   Palm Beach Police -- reflected that the date of the complaints

21   by the parents was May 22 or May 23, 2008.

22             It was the week that Mr. Epstein had hired new counsel

23   there which was a Mr. Jack Goldberger from West Palm Beach.

24   And Mr. Goldberger was scheduled, according to the incident

25   report, to meet with the representatives of the State

1   Attorney's Office.  So Lanna Belohlavek who was the head of the

2   sex offender unit of Mr. Kirshner's state attorney's office.

3            Mr. Goldberger -- again, this is hearsay, and

4   Mr. Goldberger can attest to it, if it's necessary -- was never

5   asked about this alleged incident.

6            The investigators, certainly not authorized by

7   Mr. Epstein, to go and drive people off the road.  There is

8   simply no proof that he authorized it or until discovery knew

9   it.  There was no charge against an investigator which I

10  contend there would be, given the intensity of this

11  investigation in Florida.

12           I can't explain what the facts are.  I see the report.

13  I see the claim.  But if the state attorney believed that a

14  representative of Mr. Epstein drove a parent off the road, I

15  don't think that would be missing in the negotiations between

16  his new counsel.

17           Then Mr. Goldberger was joined by Roy Black, a Miami

18  attorney who I know well.  Mr. Black has never been asked about

19  it or told about it and does not know the investigator.

20  Mr. Goldberger doesn't know the investigator.  I have no other

21  explanation, other than it doesn't rise to clear and convincing

22  evidence.

23           In terms of the wires that the government -- I think

24  that the government's language on page 11 of their submission,

25  your Honor, is most telling in terms of whether these wires

 1    constitute the predicate of detention and the predicate --

 2              THE COURT:  The $250,000 and the $100,000?

 3              MR. WEINBERG:  Yes, your Honor.

 4              The government says -- and I think they're being

 5    candid in their language in the last sentence on page 11 --

 6    that "Given the timing, it suggests" -- and I underline that

 7    word -- "the defendant was attempting to further influence

 8    coconspirators who might provide information."

 9              So the government -- and I think they've been candid

10    today -- has not confirmed the witness testimony through

11    corroboration, through any other corroborative mechanism

12    whether this was an act of generosity or an act that somehow

13    was connected to what the government suggests might have been a

14    motive.

15              But this occurring when there was no pending judicial

16    proceeding and no knowledge of a pending investigation doesn't

17    rise to the level of a federal obstruction which requires the

18    pendency or the foreseeability of a federal investigation under

19    the Supreme Court's decision in *Aguilar*, A-g-u-i-l-a-r, a judge

20    in California.

21              We just contend that even when you look backwards to

22    whether this constitutes an obstruction, the payment of an

23    employee or the payment of a friend is simply not witness

24    tampering because the Miami Herald ran an article.

25              It simply doesn't rise to the level of a past crime

1   that your Honor has clear and convincing proof occurred, much

2   less the predictive factor that if Mr. Epstein was released

3   under the kind of combination of conditions, there would be any

4   risk of his influencing adversely a witness, now that there is

5   a federal prosecution.  That would be self-destructive.  It

6   would constitute a crime with a nexus to what the statutes

7   require.

8           But the conditions also, your Honor, radically

9   limit -- we've asked your Honor for home detention, and I will

10  get to the monetary conditions and the risk of flight in a

11  moment.

12          We've asked for home detention.  We've asked for the

13  visiting list to be approved by pretrial, meaning almost nobody

14  except Mr. Weingarten and myself, Mr. Fernich, lawyers on our

15  defense team.

16          We would rip out the cell phones.  There is one line.

17  We consent to the monitoring of that line.  We consent to the

18  waiver of search and seizure.  These are the conditions that

19  have been accepted and, again, not always, Judge.  There are

20  detention orders.

21          I'm a Boston lawyer.  I remember arguing before the

22  Former Chief Judge Mark Wolf on behalf of a defendant who was

23  arrested about two months after an induction ceremony for

24  organized crime about 20 years ago.

25          And Judge Wolf found that along with financial

1    conditions, along with monetary conditions, the combination of

2    home detention, monitoring, video cameras, a visiting list

3    approved by pretrial, a waiver of search and seizure were more

4    than sufficient to abate any danger, either of obstruction or

5    of underlying criminal behavior in a case called, *U.S. v.*

6    *Patriarca.*

7              THE COURT:  That reminds me of another question.

8              Do you think that bail conditions equally apply to

9    risk of flight and/or danger to the community?  It strikes me

10   that they're different kind of concepts.

11             MR. WEINBERG:  I think your Honor is completely

12   correct.  There is an overlap.  I think the danger to the

13   community is abated more by a lesser list of conditions that I

14   don't even think the government would quarrel with, were they

15   not seeking detention.

16             We could work with the United States Attorney and

17   agree to conditions that would essentially eliminate danger

18   because he'd have no way to communicate, so long as the

19   government trusted that the lawyers who were visiting him were

20   not going to go and engage in license threatening misbehavior

21   which I assure you that Mr. Weingarten, myself, and Mr. Fernich

22   are not.

23             The conditions for flight, if I can turn to flight, I

24   contend deal directly with some of your Honor's questions about

25   the monetary conditions and some of the government's objections

1    to those that are offered.

2           So let me be as clear as I can.

3           THE COURT:  You might as well know what I'm thinking.

4    So respectfully, I don't think that the financial summary tells

5    me anything really.  For one thing, it's some unverified list

6    of assets, not audited, not certified, and not very detailed

7    either.

8           Mr. Epstein may be unusual, but there are no

9    obligations, for example, no debts, no expenses.  That,

10   depending on if that's true -- maybe he's debt free and

11   obligation free.  But that would impact whatever the list of

12   assets were if that were known too.

13          It seems to me you have to know a -- there needs to be

14   a fuller financial picture to know what would be appropriate.

15          MR. WEINBERG:  Let me be blunt.  It was our first

16   effort, and I am authorized to say to the Court that whatever

17   bond you want Mr. Epstein to sign, whether it's $100 million or

18   an amount close to the amount of the assets that we have

19   provided, Mr. Epstein is prepared to sign it.

20          He intends to appear.  Once he appears, the prejudice

21   of a large bond is extinguished.  He's met its conditions.  The

22   same with collateral.  Whatever collateral your Honor believes

23   would disincentivize him -- again, it's a temporary lien on

24   property that would be extinguished upon his appearance in

25   court, and he fully intends to appear.

1          Whereas, in our bail submissions -- and they were

2     admittedly rushed -- we did what we could amongst defense

3     counsel.  We want the Court to know that whatever monetary

4     conditions, Judge, you believe are necessary and appropriate to

5     meet the imperatives of the Bail Reform Act, which is to

6     reasonably assure his appearance.

7          And I would go farther, to virtually guarantee his

8     appearance, in combination with the home detention and

9     monitoring and limitation of communications he would accept.

10    He would sign any bond, and he would give your Honor and the

11    United States District Court clerk whatever collateral the

12    Court ordered.

13         Likewise, were your Honor to consider monetary

14    conditions, we would provide a more particularized list

15    believing that monitoring his accounts and making sure that

16    they didn't fall beneath the level of the personal recognizance

17    bail would be appropriate.

18         Again, I think to some extent, I'm backing into the

19    answer to question three which is the sealing question and

20    whether the financial information should be public.

21         I think if your Honor is to grant bail that includes

22    the monetary conditions, then this becomes a judicial document

23    that is at the heart of a bail release order, and the public is

24    entitled to it.

25         I think if your Honor is to determine that release is

1    not appropriate, despite all of the conditions that we argue

2    provide a compelling basis for both safety and appearance, that

3    I don't think the financial conditions information should be

4    other than confidential because it wasn't at the heart of the

5    judicial ruling that the public would want to understand.

6             THE COURT:  I'm not sure I understand why it comes in

7    sort of heads, I win/tails you lose.  Or no?

8             If it's a public interest and no harm in releasing it

9    and if you were to get bail you would happily release it.  But

10   if you didn't, you wouldn't, I don't really get why it wouldn't

11   just be disclosable in either case.

12            MR. WEINBERG:  It's two reasons really.  One is that

13   the financial information, if provided to pretrial, is

14   confidential and to be used by the Court for bail

15   determinations.  Two is there is an enormous public interest --

16            THE COURT:  That's true even if I determined that

17   there should be bail.

18            MR. WEINBERG:  Yes, your Honor.  But I do think, as

19   much as I'm not urging the Court to disclose it, I think there

20   are overriding considerations that if your Honor were to

21   release a man on bail, the public has a right to know the your

22   bail conditions -- how they correlate to a man's wealth.

23            If a man has a billion dollars -- and he doesn't.  If

24   your Honor were to set a $20 million bail, that's an enormous

25   bail for someone with $21 million but not an enormous bail for

1    someone with more.

2         I think in the First Amendment common law it would be

3    a judicial document of importance to explain a judicial

4    decision.

5         However, there are countervailing weights, not only

6    the bail, the pretrial statute and its confidentiality but also

7    that we are facing a trial some day.  And I know it's early,

8    but there's an enormous amount of publicity, and every fact

9    that is generated by this proceeding becomes the bases of an

10   enormous amount of articles.

11        It's one thing to say Mr. Epstein is wealthy.  That's

12   a kind of generic.  It's another thing to be chasing down

13   values and accounts.  And for that reason, we ask the Court not

14   to publish it unless it's a predicate for your Honor's release

15   decision.

16        And, similarly, if the government is to give you a

17   sample of the seizures, we would make the same request, that

18   this may be evidence some day and that it's the kind of

19   evidence that would burden his future right to a fair and

20   impartial jury in the Manhattan venue.

21        Judge, unless there are other questions, I would just

22   conclude by saying that in my many years at the bar, I've read

23   many detention requests and I've heard many detention

24   arguments.

25        Mr. Rossmiller writes eloquently and speaks

1    eloquently.  I've heard the government in different venues,

2    including this one, talk about extraordinary risks of flight

3    and extraordinary danger and to diminish the persuasiveness of

4    the set of combination of conditions.

5            Madoff was released on bail.  He surrendered.  Dryer

6    called the colossal fraud by Judge Rakoff -- he surrendered and

7    went to jail.  Mr. Skilling from the Enron fame went to jail

8    for 24 years.

9            I recently had a case with Judge Furman where the

10   government was arguing for detention that were associated with

11   somebody in a different country.  And he granted bail over

12   detention, and those defendants came to court and were

13   sentenced and went to jail.

14           I'm sure there are examples that the government here

15   can point to that certain people that can't comply with

16   conditions.  But an enormous amount of people facing detention

17   requests honor their obligations, particularly when conditions

18   are set such as the conditions that Mr. Weingarten,

19   Mr. Fernich, and I have just mentioned to the Court.

20           THE COURT:  Of the cases you just mentioned, were any

21   of them presumption cases like this one?

22           MR. WEINBERG:  I can't say they are, your Honor, but I

23   do believe that presumption becomes just a factor when the

24   burden of production is negated by in this case the 14 years of

25   non danger to the community and the danger prong and by

1  Mr. Epstein's compliance and not fleeing an almost elaboratory

2  setting where in 2004, 2005, 2006, and 2007, Mr. Epstein was

3  facing the same vigorous U.S. attorneys.

4          It wasn't until the negotiations that he knew that

5  they were open to a negotiated resolution.  But until then, he

6  was facing the same power of a very large, very resourced

7  United States Attorney's Office.

8          I did want to address the last point which is the

9  private security point, your Honor.

10          THE COURT:  Sure.

11          MR. WEINBERG:  I'm familiar with your Honor's

12  decision.  I've read it several times regarding the citizen of

13  Turkey and Iran and Macedonia that had foreign passports and no

14  ties to the United States except he was arrested while visiting

15  Disneyland, who lied to pretrial about his background which

16  Mr. Epstein did not.

17          He's not that man.  Before we even get to the issue of

18  whether or not your Honor would reconsider your strongly felt

19  feelings about whether or not the additional condition, on top

20  of all of the other conditions of money and home detention, the

21  additional conditions -- I could frame it as a trustee, which

22  is somebody that the U.S. Attorney would respect, be credible,

23  living at Mr. Epstein's home, and making sure that there were

24  no violations.

25          I know the government would say that's like a

1    bracelet.  It's just a head start.

2              THE COURT:  I was going to ask about that.

3         So there is a suggestion in the bail package that two

4    trustees would be living with him.  I have not experienced

5    anything like that before, either in reality or in an

6    application.

7         Mr. Weingarten reminds me that a representative of the

8    company that has been approved by other courts for the security

9    prong is here and could speak to that condition, whether it's a

10   trustee condition or whether it's a private guard condition.

11        But I did want to make one point about the law because

12   I know your Honor knows the law better than I.  Judge Bianco

13   and your Honor and maybe several other judges are on one side

14   of a debate.  Judge Rakoff and maybe other judges on another.

15        I read carefully the Second Circuit decisions.  There

16   are three of them.  The most recent one actually is the

17   *Esposito* decision where the court says that a private guard in

18   that case is appropriate because he wouldn't be a flight risk

19   but for his wealth.

20        So there isn't this kind of invidious discrimination

21   between somebody who is poor and someone who is wealthy because

22   if a person is poor, even someone in Mr. Epstein's position,

23   the government would not be making the same kind of flight

24   arguments that are predicated upon his wealth.

25        So they uphold the private guard saying it doesn't

1   reach the decision some day the Second Circuit may have to

2   address about whether or not a wealthy person should be denied

3   release because the private guard condition somehow is more

4   like detention than release.

5          We need him released, Judge.  This is an enormously

6   challenging case for his defense counsel.  The government is

7   hugely resourced.  They've got over a million pages of

8   discovery.

9          He's in the SHU unit.  It's not a condition that

10  somebody can defend themself.  And Mr. Epstein's goal, like it

11  was before, is to hire counsel to defend him and to work with

12  counsel closely to exercise his presumption of innocence, to

13  defend himself in a principled way in a courtroom, and not to

14  flee.  And I would urgently ask your Honor to consider our bail

15  application.

16         THE COURT:  I will.

17         MR. WEINBERG:  Thank you, Judge.

18         THE COURT:  I will consider and reconsider.

19         On that point, I noticed that was the last paragraph I

20  think in your letter -- I'll examine that again too -- here is

21  my reaction.  I don't know if this is legally sustainable or

22  not.  I will look at the cases.

23         You have all these people or have had on Rikers Island

24  who can't make a thousand dollars bail, for example, and they

25  have every right to consult with their lawyer, perhaps even

1    more so than someone who is educated and privileged, and they

2    might need it more.

3            I think everybody has the same right, but it's very

4    hard.  If the test is consult with counsel, well, then all this

5    other conversation we've been having is out the window because

6    everybody has a right to consult with counsel, and we have to

7    come up with a new set of cases and a new set of tests.

8            By the way, don't think I don't appreciate that a

9    defendant should be counseled and should be able to consult

10   with counsel.  But if that's the standard, then what are we

11   going to tell all those people who can't make a $500 or $1,000

12   bail who say, I want to talk to my lawyer because the

13   immigration authorities are going to come and take my wife

14   away, etc., etc., separate the kids.

15           MR. WEINBERG:  I have three answers to that too.

16           THE COURT:  I'd like them.

17           MR. WEINBERG:  That's an important question.  The

18   first is that the defendants in Rikers Island, or at least the

19   vast majority of them, are not facing a prosecution team as

20   well resourced and as talented as this one.  They're not facing

21   a million pages of discovery.  There may be exceptions.

22           THE COURT:  They might be facing a lot more serious

23   consequences in terms of jail or incarceration for let's say

24   assault or murder or rape or whatever, and many of them do face

25   those consequences.

1          MR. WEINBERG:  I do understand, but it's the

2    complexity and the magnitude of the pretrial preparation, not

3    just the sentencing consequences that requires us to put that

4    issue before the Court.

5          Second, I'm not here to say there should be those kind

6    of monetary conditions.  I know, at least in my state, the

7    Commonwealth of Massachusetts, there's a movement that I read

8    regularly about in the Boston Globe -- maybe it's similar

9    here -- to stop that state practice.

10         THE COURT:  It is.

11         MR. WEINBERG:  Third, the Bail Reform Act, the federal

12   Bail Reform Act of 1984, has a provision saying that a

13   defendant should not be denied release based on their inability

14   to satisfy a monetary condition.  So I think to some extent

15   Congress disapproves of locking someone up because there's a

16   $500 bail that they can't make.

17         I'm 73 years old.  I grew up in the Warren Court

18   where life was different, and the criminal justice system got

19   politicized to some extent.  I think there is almost the

20   reaction to the excess, the overcriminalization, the

21   overimprisonment that characterized the 1980's and the war on

22   crime and the war on drugs.

23         So I at least stand here, as someone with over 45

24   years of observation, and believe and hope that one of the

25   areas that we begin to reverse the excess is in keeping so many

1   presumed innocent people in jail, whether it's Rikers Island or

2   the MCC.

3          I again passionately urge your Honor to consider

4   Mr. Epstein's release.  Thank you so much for the time, Judge.

5          THE COURT:  Thank you.

6          Anybody else?  Did you want to comment?

7          MR. ROSSMILLER:  If we could just briefly respond,

8   your Honor.

9          THE COURT:  Also I know if there are going to be any

10  more submissions in response to today, can you do them by noon

11  tomorrow?  Is that reasonable?

12         MR. WEINBERG:  5:00 would be easier, given my travel

13  obligations, Judge.  And I do want to meet the government's

14  reference today to a 1982 passport when he was 28 years old

15  that expired over 30 years ago.  I'd rather address that when I

16  have some more time.

17         THE COURT:  5:00.

18         What about you, Mr. Rossmiller?  Are you going to

19  respond?

20         I don't know if there are open issues, but there are

21  some instances where you're entitled to rest on the record,

22  but the search of the East 71st mansion, there might be some

23  evidence from that.

24         MR. ROSSMILLER:  Your Honor, I can tell you certainly

25  we'd be prepared to file anything additional by tomorrow at

1    5:00.  That's no problem.

2              THE COURT:  Fair enough.

3              MR. ROSSMILLER:  I can't say whether we will, but

4    we'll certainly re-examine the record.

5              THE COURT:  So you'll look at the record, so to speak,

6    and what we discussed here today and see where there could be

7    some more strength in terms of evidence.

8              MR. ROSSMILLER:  Yes, your Honor.

9              Just very briefly to respond, and I'll try to go sort

10   of lightning round through some of these.

11             Starting at the very beginning with this issue of

12   being able to prepare a case having access to counsel, the idea

13   that detention impairs the ability to prepare a defense -- this

14   is certainly a challenging case.  It's a significant case.

15             This Court has significant experience with precisely

16   that type of case with a detained defendant in *Zarrab*.  In that

17   case, I think the Court saw -- and the country and the world

18   saw -- that it is eminently possible for a defendant to have

19   excellent, excellent counsel and every opportunity to consult

20   with that counsel while detained and while detained here.

21             I'm not specifically familiar with the conditions of

22   Mr. Zarrab's detention, but my general understanding is that

23   there were concessions made with respect to his ability to

24   review documents and have space.

25             Those are certainly factors that we're willing to be

1    in touch with the defense about.  But there is a proven,

2    existing example for how that works and how that works well.

3           What the defendant is asking for here is for special

4    treatment to build his own jail, to have his own private jail

5    that he gets to stay in away from everybody else who is in jail

6    and have him be limited in his own gilded cage surrounded by

7    people with guns, surrounded by trustees with cameras on all

8    sides of his house.  A person who needs those conditions should

9    be detained.

10          Second, the issue of whether the case was brought to

11   us, whether this was funneled to the Southern District of New

12   York from anywhere else, your Honor, it was not.  It was not

13   brought to us by anyone else.

14          We opened the case.  We investigated the case.  By

15   "we," I mean the FBI, CBP, the NYPD, and of course the U.S.

16   Attorney's Office.  We opened the case.  We investigated the

17   case.  And I can tell you that not one of the prosecutors

18   sitting at this table has spoken with anyone at the Southern

19   District of Florida.

20          The issue of the Department of Justice appeal by the

21   defendant is a distraction from the bail determination,

22   your Honor.  The chain of events that defense counsel describes

23   makes clear that the Department of Justice did not have a role

24   in negotiating the NPA.

25          It didn't have any role in confirming if other

1    districts were aware of it, which there is no evidence that

2    they were.  The approval of jurisdiction to contemplate federal

3    charges and a federal NPA, as the defendant tried to wiggle out

4    of this agreement after it had been signed, is different from

5    having the NPA apply outside of the Southern District of

6    Florida which it does not.

7            What they're describing is a normal appeal process,

8    and there is an entirely separate process for getting coverage

9    outside of the relevant district, and what they're describing

10   ain't it.  It didn't happen here.

11           Your Honor, the defense has kept coming back to this

12   idea of 1591 being enslavement, of pimping people out, of

13   people servicing individuals 15 to 20 times a day as they

14   mentioned in one of its submissions.  Quintessential sex

15   trafficking is sex trafficking that is met by the elements of

16   the crime which we have here.

17           The defense said we don't have consent here or putting

18   the issue of consent aside.  Your Honor, it's underage girls.

19   It's underage girls that are involved in this case, and it's

20   underage girls who are the victims.  To say that consent is

21   some sort of a separate issue that we should ignore is

22   offensive, frankly, and it's not supported by the law.

23           Moving along, with respect to compliance following a

24   prior conviction rebutting the presumption, it's easy to figure

25   out why that's not the case, your Honor.  I'll explain why.

1          Here's how we know that it's not the case that someone

2   who doesn't commit a crime for 15 years, if that is the case

3   here, but for someone who has not been convicted of a crime for

4   15 years, that that establishes the rebuttal of presumption.

5          The reason we know that's not the case is because

6   someone who is 70 years old who is arrested for the very first

7   time who's lived a law-abiding life for 70 years is still

8   subject to the presumption.

9          So the idea that if you're convicted of a crime and

10  then you're not convicted of a crime for a while, that that

11  itself rebuts the presumption, really turns the presumption on

12  its head.  That simply doesn't make any sense, your Honor.

13         With respect to the idea that it's old conduct which

14  is related, the statute of limitations goes very far back.  And

15  in fact, there is no explanation for this type of crime.

16         Congress has decided that if you commit sex crimes

17  against children, you will have to look over your shoulder for

18  the rest of your life.  And that's as it should be, your Honor.

19  Certainly there is no argument here from the defense regarding

20  the statute of limitations.

21         The defense has argued a couple different times about

22  a couple different things that if there was a crime, it would

23  have been charged.  So in discussions of obstruction, in

24  discussions of witness tampering.

25         Your Honor, the idea that if there was misconduct it

1   would have been charged is particularly rich in this case.

2   There are plumes of smoke as to those particular issues, and

3   the Court can reasonably infer that there is fire.

4       The idea that Mr. Epstein was feeling particularly

5   generous to his old friends and associates days after the Miami

6   Herald published a series of articles about his misconduct and

7   the circumstances leading to his non-prosecution agreement is

8   not credible, and the Court shouldn't find it to be credible.

9       Finally and most importantly, this idea that the

10  defendant has disciplined himself, the defendant is asking the

11  Court to risk the safety of the community on the

12  self-discipline of a man they appear to concede has a

13  preference for underaged girls.

14      This idea that he has disciplined himself is a

15  concession that the defendant has a problem, that he has an

16  appetite for children.  Your Honor, the defendant keeps telling

17  on himself here.

18      They concede that the government will be able to show

19  the elements of the crime.  They concede that he has to

20  discipline himself to avoid committing the types of crimes he

21  has before.

22      They say that he didn't flee because he thought that

23  there was the potential he would be -- I'm sorry.  They say he

24  didn't flee despite the fact that he thought there was a

25  potential to be charged.

1          That's not consistent with the explanation that he had

2   no idea that there was a federal case that would be brought

3   when he made the payments to his old associates.

4          The fact is, your Honor, the defendant thought he'd

5   gotten away with it.  And the government really put its money

6   where its mouth is on this issue of notice and of the covert

7   nature of the investigation.

8          This investigation was going on for months, and the

9   government took extraordinary efforts not to have the defendant

10  find out about it, and he didn't.  And neither did anyone else

11  until the case was unsealed.

12         Any number of people in this court who would have

13  loved to have reported the fact of this investigation, and it

14  didn't get out because the government was concerned that the

15  defendant would flee as we continue to be now.

16         Your Honor, this is the Southern District.  The

17  defendant is indicted.  He is in a grave position, and he has

18  every motive and every means to flee if he's released.

19         THE COURT:  I have one question of you.

20         In your submission -- I think it was in your most

21  recent submission -- you mentioned that you had been contacted

22  by victims or their counsel probably or perhaps and that they

23  were of the view that there should not be any bail, any

24  release.

25         Are you aware if any of them wish to be heard?

1   Mr. Boies?

2            MR. BOIES:  Yes, your Honor.

3            THE COURT:  Hold on one second.  Mr. Boies, just wait

4   until we finish with them.

5            I take it that the answer is yes?

6            MR. BOIES:  Yes, your Honor.

7            THE COURT:  Go ahead.

8            MR. ROSSMILLER:  Your Honor, my understanding,

9   including from representatives of the Boies, Schiller law firm,

10  is that victims have expressed the views that we conveyed to

11  the Court.

12           I was not aware of any victims or victims' counsel who

13  wished to be heard today, though we have made efforts to reach

14  out to a variety of victims and counsel.

15           THE COURT:  That's fine.  I'm just asking you, and

16  Mr. Boies wishes to be heard on behalf of them.  I think that's

17  perfectly fine.  I think it's just fine.

18           MR. ROSSMILLER:  Understood, your Honor.

19           THE COURT:  Counsel, did you want to get the last

20  word?

21           MR. WEINBERG:  Just two brief matters.

22           THE COURT:  Okay.

23           MR. WEINBERG:  First, the government has been

24  repeatedly saying that Mr. Epstein concedes the elements or the

25  evidence.  That's simply not so.  He's going to defend this

1    case.

2           Second, there's an inherent contradiction between the

3    government's tying these two payments by Mr. Epstein in

4    November and early December of 2018 to witnesses as if these

5    are akin to an attempt to influence a witness.

6           If the government's position has any reality to it,

7    that Mr. Epstein reads an article and perceives that a friend

8    may be a witness, then that provides pretty strong evidence

9    that Mr. Epstein was concerned about an investigation.

10          Even if the government kept it secret and yet he

11   repeatedly flew not just out of the country but into the

12   country with the knowledge, with the belief, again, if the

13   government can tie these payments to an understanding, an

14   intent to effect a future investigation, that provides fairly

15   eloquent evidence, your Honor, that Mr. Epstein does not intend

16   to flee.

17          And his conduct between November and December 3, 2018,

18   and the present is the antithesis of a defendant who wants to

19   flee.  He was arrested flying into Teterboro from Europe.

20          Lastly, Mr. Joseph Jaffe is here, your Honor.  If

21   your Honor in any way wanted him to inform the Court what

22   services he and his company can provide to better or to be one

23   of the multiple conditions that we've offered the Court as a

24   condition of release, he is here.

25          THE COURT:  I could ask you through him or him

1    directly.

2              MR. WEINBERG:  I'd rather you ask him, your Honor.

3    Thank you.

4              THE COURT:  Then we'll get to Mr. Boies.

5              By the way, before we do, does everybody here except

6    me know who the two people are who got the $250,000 and

7    $100,000 checks?

8              MR. ROSSMILLER:  Your Honor, we've advised defense

9    counsel who those individuals were.  Yes.

10             THE COURT:  Can you tell us.

11             MR. ROSSMILLER:  We're not prepared to make that

12   statement currently, your Honor.

13             MR. WEINBERG:  Generically, your Honor, they're

14   long-time friends and employees of Mr. Epstein.  One is a

15   friend.  One is an employee.

16             THE COURT:  Okay.  The only question I really have --

17             MR. ROSSMILLER:  I'm sorry, your Honor.  I apologize

18   for interrupting.

19             I should say the government is more than happy to

20   advise the Court of that information in a sealed submission.  I

21   just don't want to reveal the names of potential witnesses and

22   frankly potential victims in open court at this time.

23             THE COURT:  So you know them, and the defense knows

24   them as well.

25             MR. ROSSMILLER:  We're happy for the Court to know

1     them, but that's not something that we're prepared to file

2     publicly.

3                THE COURT:  Is that okay with you if he submits

4     something?

5                MR. WEINBERG:  Yes, your Honor.

6                THE COURT:  So the only question I have of you is

7     these trustees or guards -- are they armed?

8                MR. JAFFE:  They will either be armed or unarmed as

9     the U.S. Attorney and defense counsel agree, and we will follow

10    that order, your Honor.

11               THE COURT:  Got it.

12               Mr. Boies, you're going to get the last word here.

13               MR. BOIES:  May it please the Court, your Honor.  I'll

14    be very brief, and I apologize.  I wasn't planning to speak

15    today.

16               But there was one thing that I wanted to clarify for

17    the Court that came up, and I would like one of the victims

18    that I represent who is here in court to be able to just speak

19    to you for 60 seconds.

20               THE COURT:  Sure.

21               MR. BOIES:  The matter that I wanted to clarify is

22    that counsel for the defendant indicated that there was no

23    proceeding pending at the time that the payments of $250,000

24    and $100,000 were made.

25               It's true that there was no federal criminal

1  proceeding against him pending, but we had a case pending

2  against him at that time.  And we were in the middle of

3  discovery, and we had situations in which we had witnesses who

4  were cooperating with us and then were contacted by either

5  Mr. Epstein or his lawyers and who then stopped cooperating

6  with us.  So I thought the Court ought to have that piece of

7  information.

8        THE COURT:  So that sort of supports the idea that

9  payments were made or at least the inference that one could

10  draw to keep people silent.

11        MR. BOIES:  Yes.  I don't personally know to whom they

12  were made, and I have been given no explanation as to why they

13  were made.

14        What I do know is that this was a time when we had

15  intensive evidence to take depositions and discovery and

16  interview present and former employees of Mr. Epstein.

17        We had experience where if we contacted somebody and

18  we actually had some conversations with them, then Mr. Epstein

19  would get them a lawyer, and they would stop cooperating.  That

20  proceeding was still going on at the time that these payments

21  were made.

22        If I could just introduce you to Annie Farmer who is

23  one of our clients who would just like to speak very briefly to

24  the Court.

25        THE COURT:  Sure.

1          MS. FARMER:  Hello, your Honor.

2          THE COURT:  Could you help us out and spell your first

3   and last name.

4          MS. FARMER:  Yes.  Annie Farmer, A-n-n-i-e

5   F-a-r-m-e-r.

6          I was 16 years old when I had the misfortune of

7   meeting Jeffrey Epstein here in New York.  He later flew me to

8   New Mexico to spend time with him there.

9          I wanted to voice my support for the government's

10  request that his bail not be set and also just my reaction to

11  the fact that the defense was claiming that it would be perhaps

12  easier for victims or more likely for victims to come forward

13  given the publicity and some of the other issues surrounding

14  this case.

15         Well, I would say that it would be quite the opposite;

16  that his wealth and privilege and the notoriety of the case

17  would actually make it I think often more difficult.

18         Also that they now were arguing that the discipline of

19  this time, but yet we know that they have found photos of young

20  women in his home and that if he's continuing to engage with

21  pornography of young women, I would say that would be quite the

22  opposite of disciplining.

23         Also those victims in the photographs are continuing

24  to be victimized.

25         THE COURT:  Are you in a position to answer this

1    question?  Are you saying that Mr. Epstein engaged in sexually

2    inappropriate conduct with you?

3          MS. FARMER:  He was inappropriate with me.  He was

4    inappropriate with me.  I would prefer not to go into the

5    details of that at this time.  Yes.

6          THE COURT:  Thank you very much.

7          MS. FARMER:  You're welcome.

8          MR. EDWARDS:  Your Honor, may I also be heard?

9          THE COURT:  Absolutely.

10          MR. EDWARDS:  Brad Edwards.  I represent Courtney Wild

11    who wishes to make a statement today to the Court.  Let me just

12    give you a brief context.

13          THE COURT:  Could you just for a minute spell her

14    name.

15          MR. EDWARDS:  Sure.  Courtney, C-o-u-r-t-n-e-y, Wild,

16    W-i-l-d.

17          Just for context, I have represented her since 2008 in

18    a civil action as lead counsel that we filed against the

19    United States Attorney's Office under the Crime Victims' Rights

20    Act where we have alleged and now proven that the previous

21    non-prosecution agreement was structured in violation of the

22    rights of many of the victims.

23          Courtney Wild was the Jane Doe in that lawsuit.  And

24    for that reason, she has a particular interest in this case.

25    We want to first say we appreciate your Honor's acknowledgment

1    of the Crime Victims' Rights Act and the rights of the victims,

2    particularly the way in which they're being treated in this

3    particular process which is different than last time.

4              So with that, if your Honor had any questions to

5    educate the Court on the CVRA case, I would answer them.  But

6    otherwise, she would just like to make a statement.  Thank you.

7              THE COURT:  Absolutely.

8              MS. WILD:  Hi, your Honor.  My name is Courtney Wild.

9    I was sexually abused by Jeffrey Epstein starting at the age of

10   14.  And I would just like to ask the Court to not grant him

11   bond, to keep him in detention just for the safety of any other

12   girls out there that are going through what I'm going through.

13   It is a public case, and it's just -- he's a scary person to

14   have walking the streets.

15             THE COURT:  Where did that occur?  The sexual

16   inappropriateness.

17             MS. WILD:  In Palm Beach, Florida.

18             THE COURT:  Great.  Thank you so much.

19             MS. WILD:  Thank you.

20             THE COURT:  I think that concludes our work for today.

21   I'll hopefully see you all on Thursday.  Thanks very much.

22             (Adjourned)

23

24

25